

1999 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

12-30-1999

# Local 19 v. Herre Bros. Inc.

Precedential or Non-Precedential:

Docket 97-7450

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1999

Recommended Citation

"Local 19 v. Herre Bros. Inc." (1999). *1999 Decisions.* Paper 335.
http://digitalcommons.law.villanova.edu/thirdcircuit_1999/335

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1999 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed December 30, 1999

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 97-7450

SHEET METAL WORKERS' INTERNATIONAL
ASSOCIATION LOCAL 19

v.

HERRE BROS., INC.
         Appellant

On Appeal from the United States District Court
for the Middle District of Pennsylvania
D.C. Civil Action No. 95-cv-02131
(Honorable Sylvia H. Rambo)

Argued April 26, 1999

Before: SCIRICA, ROTH and MCKAY,*
Circuit Judges

(Opinion filed December 30, 1999)

_____

* Honorable Monroe G. McKay, Circuit Judge, United States Court of
Appeals for the Tenth Circuit, sitting by designation.

Ronald M. Katzman, Esquire
  (Argued)
Steven E. Grubb, Esquire
Goldberg, Katzman & Shipman, P.C.
320 Market Street
Strawberry Square
P. O. Box 1268
Harrisburg, PA 17108

Thomas R. Davies, Esquire (Argued)
Harmon & Davies, P.C.
2306 Columbia Avenue
Lancaster, PA 17603

 Attorneys for Appellant

Bruce E. Endy, Esquire (Argued)
Spear, Wilderman, Borish, Endy,
 Spear and Runckel
230 South Broad Street –
 Suite 1400
Philadelphia, PA 19102

 Attorney for Appellee

OPINION OF THE COURT

MCKAY, Circuit Judge.

This appeal arises from a dispute between Plaintiff Sheet Metal Workers' International Association Local 19 [Union], Defendant Herre Bros., Inc., and a third party, Sheet Metal Contractors Association of Central Pennsylvania[SMCA] concerning the enforcement of a collective bargaining agreement. Herre Bros. attempted to revoke its bargaining rights in the SMCA with the intent that it would not be bound by a later-negotiated collective bargaining agreement between the SMCA and the Union. The Union sued Herre Bros., taking the position that Herre Bros. was bound to the Union's 1995 agreement with the SMCA. The district court granted summary judgment to the Union, ruling that Herre Bros. was bound to the 1995 collective bargaining agreement, and ordered specific performance of that

agreement after a trial on damages. Herre Bros. appeals the district court's rulings.

I

Herre Bros. is a mechanical and electrical contractor in Enola, Pennsylvania, engaged in the construction of sheet metal, piping, plumbing, heating, and air conditioning. Beginning in at least 1992, Herre Bros. joined the SMCA, a multiemployer bargaining association comprised of sheet metal and air conditioning contractors. The parties agree that as a result of that membership Herre Bros. was a party to the collective bargaining agreement between the Union and the SMCA which was effective from June 1, 1992, through May 31, 1995. In February 1995, Herre Bros. notified the SMCA that it no longer authorized the association to bargain on its behalf. Subsequently, the SMCA sent, and the Union received, notice that the association no longer had the bargaining authorization of Herre Bros. This notification was signed by Anthony J. Forlizzi, who was both president of the SMCA and vice-president of Herre Bros. In the meantime, the 1992 collective bargaining agreement was nearing expiration and the parties set about negotiating a new agreement.

The SMCA and the Union entered into a new agreement effective June 1, 1995, to May 31, 1998, but Herre Bros. and the Union failed to negotiate any agreement. Near the end of the bargaining between Herre Bros. and the Union, in August and September 1995, the Union allegedly discovered that Herre Bros. was still an active member of the SMCA despite its revocation of bargaining rights. The Union took the position that Herre Bros. was bound by the 1995 agreement because of Herre Bros.' continuing membership in the SMCA. Herre Bros. then withdrew its membership from the SMCA and refused to be bound by the 1995 agreement. For its part, the SMCA refused to either provide the Union with a copy of its by-laws and constitution or convene a Joint Adjustment Board to hear a grievance against Herre Bros. In response, counsel for the Union indicated that the Union would file unfair labor practice charges with the National Labor Relations Board.

3

In December 1995, the Union filed a complaint pursuant to 29 U.S.C. S 195 against Herre Bros. claiming that it had breached the 1995 collective bargaining agreement with the Union by failing to recognize that agreement and adhere to its terms.1 Meanwhile, a panel of the National Joint Adjustment Board unanimously decided on March 21, 1996, that Herre Bros. was bound to the existing collective bargaining agreement effective from June 1, 1995, through May 31, 1998, because Herre Bros. "did not follow the procedures required to properly withdraw their bargaining rights[ ] and Association membership." 2 App., Vol. II at 236A.

On cross-motions for summary judgment on the issue of liability, the district court granted partial summary judgment to the Union in an order filed September 16, 1996. See id. at 256A. The court determined that Herre Bros. had not effectively withdrawn from the SMCA and therefore was bound to the terms of the new agreement. The court, however, deferred entry of judgment until the conclusion of the case. It also denied Herre Bros.' motion for reconsideration of the summary judgment decision. On November 18, 1996, the district court conducted a bench trial on the issue of damages. On August 27, 1997, the court entered an Order and Memorandum that disposed of some of the damages issues in the case and granted specific performance of the 1995 agreement but which again deferred entry of judgment until the conclusion of the case. See id., Vol. I at 12A, 14A.

_____

1. The Union also named the SMCA in the suit, claiming that it breached the 1995 agreement by refusing to convene a grievance panel to hear the Union's dispute. On July 8, 1996, the Union voluntarily dismissed the SMCA from its complaint.

2. In its amended complaint in federal court, the Union argued that Herre Bros. was bound by the Adjustment Board's decision that Herre Bros. was a party to the contract because Herre Bros. had failed to move to vacate the award within the time permitted by statute in Pennsylvania. We do not address the Union's argument on appeal that Herre Bros. should have filed a motion to vacate the decision of the National Adjustment Board before filing suit in federal court because it is not necessary to our resolution of the dispute and because the Union did not raise it before the district court in this case.

4

II

As a threshold issue, we must determine whether the district court's order, or a portion thereof, is appealable or whether the appeal should be dismissed for lack of jurisdiction. The August 27, 1997 Order from which the appeal is taken granted judgment to the Union in the amount of $325,203.98; required Herre Bros. to provide the Union with an accounting of all hours worked by nonunion workers between September 27, 1996, and the date of the order; allowed the Union to file a supplemental brief requesting damages to union funds resulting from Herre Bros.' failure to utilize union workers after September 27, 1996, and allowed Herre Bros. to file a reply brief thereto; directed Herre Bros. to specifically perform the 1995 contract between the Union and the SMCA until it expired in 1998; and directed the clerk of the court "to defer entry of judgment until the conclusion of the case." Id. at 12A–13A. Herre Bros. filed its notice of appeal from this order on September 14, 1997.

In a letter dated September 16, 1997, this court notified the parties that the appeal would be submitted for possible dismissal due to a jurisdictional defect, namely, that the order filed August 27, 1997, did not appear to befinal within the meaning of 28 U.S.C. S 1291. In response, both parties contend that the August 27 Order is appealable because the portion of it which directs specific performance of the 1995 agreement is an appealable interlocutory order. It seems clear and is beyond dispute that the August 27 Order is not a final judgment in that it does not dispose of all of the damages issues in the case and because it defers entry of judgment until a later undetermined time. Nonetheless, we believe the parties are correct in arguing that the specific performance portion of the August 27 Order is appealable under 28 U.S.C. S 1292(a)(1) based on the following analysis.

In its Memorandum accompanying the August 27 Order, the district court made findings of fact and conclusions of law concerning damages. The court found that the Union sought various money damages, "a declaratory judgment that Herre [Bros.] [was] bound by the 1995 agreement," and "specific performance requiring Herre [Bros.] to honor the

5

1995 agreement." Id. at 18A–19A. In analyzing monetary damages, the court stated that the Union "[was] entitled to" damages for work performed by union members and nonunion members after June 1, 1995, id. at 19A, 32A, and also to liquidated damages. See id. at 31A, 33A. In its discussion of declaratory relief, the court explained that because it had previously determined that Herre Bros. was bound by the 1995 agreement "the clerk of [the] court [would] enter judgment in favor of [the Union] on the issue of liability" at the conclusion of the case. Id. at 31A. The court then discussed the Union's demand of specific performance which would require Herre Bros. "to hire all of its workers from the union hiring hall." Id. at 32A. The district court granted this relief, concluding that Herre Bros. "[would] be directed to specifically perform the 1995 contract for the remainder of its term." Id. at 33A. In contrast to the court's language in the Memorandum determining that the Union was entitled to certain damages and a declaratory judgment, the court clearly stated that it was directing Herre Bros. to specifically perform the 1995 agreement until its expiration in May 1998. See id. at 32A–33A. Further, while the declaratory relief portion of the Memorandum clearly deferred entry of judgment until the conclusion of the case, see id. at 31A, the paragraph granting specific performance contained no such limitation. See id. at 32A. These differences in the court's use of language leads us to conclude that the court intended the order of specific performance to be an injunctive order that was effective immediately. In addition, we believe that the specific enforcement of the 1995 agreement falls under the definition of an injunctive order because it was "directed to a party, enforceable by contempt, and designed to accord or protect some or all of the substantive relief sought" by that party. Cohen v. Board of Trustees, 867 F.2d 1455, 1465 n.9 (3d Cir. 1989) (citations and quotation marks omitted); see also Allegheny Energy, Inc. v. DQE, Inc., 171 F.3d 153, 154 (3d Cir. 1999) (characterizing the denial of specific performance as a preliminary injunction).

Our treatment of the specific performance portion of the August 27 Order as an appealable injunctive order also is supported by a subsequent order filed by the district court. In this later order, filed September 19, 1997, the district

6

court stayed pending appeal the portion of the August 27 Order that directed specific performance.3 See Attach. to Appellant's Br. (September 19, 1997 Order at 2). The court's decision to grant a stay pursuant to Fed. R. Civ. P. 62(c) reveals that it had intended the injunctive order compelling specific performance to be enforceable immediately upon filing the August 27 Order. See Cohen, 867 F.2d at 1466.

For these reasons, we conclude that the August 27, 1997 Order is an appealable interlocutory order under 28 U.S.C. S 1292(a)(1), see id. at 1468 (holding that an order of specific performance of a contract has been regarded as a classic form of equitable relief and falls within S 1292(a)(1)), and we have jurisdiction over the specific performance portion of that Order.

To review this appeal, i.e., to determine whether specific performance is merited, we need to review the question of liability. Clearly, the court's grant of injunctive relief was predicated on its prior summary judgment determination that Herre Bros. was bound to the 1995 contract. See id. As a result, and to avoid having to reexamine this issue after entry of final judgment, we conclude that our jurisdiction over the specific performance question necessarily requires us to address whether the district court correctly granted summary judgment to the Union by determining that Herre Bros. was bound to the 1995 agreement.

_____

3. The court also stayed the portion of the August 27 Order directing an accounting and supplemental briefing on damages, and it purported to amend the September 16, 1996 summary judgment order and the August 27 Order by directing that judgment would be entered on September 19, 1997. We note that the September 19, 1997 Order is neither a final judgment nor appealable for reasons discussed in our decision in the appeals and cross-appeals related to this case. See Sheet Metal Workers' Internat'l Ass'n Local 19 v. Herre Bros., Inc., Nos. 97-7552, 7553, 7554, 7555 (3d Cir., December 30, 1999).

On September 23, 1997, the court filed an order to correct clerical errors contained in the judgment that was filed pursuant to the September 19, 1997 Order. The substance of the September 19 and September 23 Orders is identical.

7

III

Our resolution of this appeal turns first on whether Herre Bros. is bound to the 1995 collective bargaining agreement executed by the Union and the SMCA. If Herre Bros. is so obligated, we also must determine whether the court properly ordered specific performance of the 1995 agreement. We therefore first examine whether the district court erred in granting partial summary judgment to the Union by determining that Herre Bros. was bound to the 1995 collective bargaining agreement.

We review the court's partial grant of summary judgment de novo, applying the same standards used by the district court. See Salley v. Circuit City Stores, Inc., 160 F.3d 977, 980 (3d Cir. 1998) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986)). We must determine whether the record, when viewed in the light most favorable to the non-moving party, namely, Herre Bros., shows that there are no genuine issues of material fact and that the moving party was entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c); Salley, 160 F.3d at 980; Antol v. Perry, 82 F.3d 1291, 1294–95 (3d Cir. 1996).

A

At the heart of this dispute is the distinction between two types of multiemployer bargaining relationships. 4 Under S 9(a) of the National Labor Relations Act, 29 U.S.C. S 159(a), a union may become the exclusive bargaining representative of an appropriate unit of employees if a majority of employees designate the union as the representative. It is well established that an employer with a S 9(a) relationship to a union has an obligation to negotiate a successor contract with the union in good faith and that the union enjoys a presumption of majority status. See James Luterbach Constr. Co., 315 N.L.R.B. 976, 979

_____

4. The Union claims that Herre Bros. waived this issue because it did not raise it before the district court at the appropriate time. Because the district court addressed the distinction between multiemployer bargaining associations in its summary judgment order, the issue is properly before this court on appeal.

8

(1994). Accordingly, neither an employer nor a union governed by S 9(a) may unilaterally withdraw from the multiemployer bargaining unit or the collective bargaining agreement; instead, withdrawal is subject to specific requirements. See Retail Assocs., Inc., 120 N.L.R.B. 388, 393–95 (1958).

Unlike a S 9(a) relationship, an employer member of a multiemployer bargaining unit who has a relationship with a union under S 8(f) of the NLRA, 29 U.S.C.S 158(f), does not have an obligation to bargain for a successor contract. See Luterbach, 315 N.L.R.B. at 979; Patterson-Stevens, Inc., 316 N.L.R.B. 1278, 1285 (1995). Section 8(f) differs because it allows employers engaged primarily in the building and construction industry to enter into pre-hire agreements which contain union security clauses whether or not the union represents a majority of the employer's employees. See 29 U.S.C. S 158(f). Because the union enjoys no presumption of majority status, either party in aS 8(f) relationship is free to unilaterally withdraw and"avoid any obligation to bargain for a successor contract" upon the expiration of the collective bargaining agreement. 5 Luterbach, 315 N.L.R.B. at 978; see also John Deklewa & Sons, Inc., 282 N.L.R.B. 1375, 1385 & n.42 (1987) (holding

_____

5. Historically, a S 8(f) agreement could be repudiated by either party at any time for any reason. See John Deklewa & Sons, Inc., 282 N.L.R.B. 1375, 1378 (1987), enf 'd sub nom. International Ass'n of Bridge, Structural & Ornamental Iron Workers v. NLRB, 843 F.2d 770 (3d Cir. 1988). Under pre-Deklewa case law, a S 8(f) relationship converted into a S 9(a) relationship merely upon a showing that the signatory union enjoyed majority support during a relevant period among an appropriate unit of the signatory employer's employees. See id. "[U]pon conversion, an employer [was] `under the statutory duty to recognize and bargain with the union as the employees' exclusive representative.' " Id. at 1379. Finding several flaws in the conversion doctrine, including its failure to foster industry stability or advance the objective of employee free choice, the Board in Deklewa rejected the doctrine, see id. at 1380–84, and held that parties to an 8(f) agreement are required to comply with that agreement until it expires unless employees vote to reject or change the bargaining representative. See id. at 1385. Accordingly, neither employers nor unions are free to unilaterally repudiate such an agreement for the life of the agreement but may only do so upon its expiration. See id. at 1385–86.

that S 8(f) agreements are enforceable during the life of the agreement but impose no continuing obligation to bargain following the termination of that agreement), enforced sub nom. International Ass'n of Bridge, Structural & Ornamental Iron Workers v. NLRB, 843 F.2d 770 (3d Cir. 1988). Luterbach instructs that an 8(f) employer will be bound by multiemployer bargaining only if it is "part of the multiemployer unit prior to the dispute" and"has, by a distinct affirmative action, recommitted to the union that it will be bound by the upcoming or current multiemployer negotiations." Luterbach, 315 N.L.R.B. at 980. Thus, "mere inaction during the multiemployer negotiations will not bind an 8(f) employer to a successor contract." Id. at 979.

Because the distinction between 8(f) and 9(a) significantly affects the analysis concerning withdrawal from a multiemployer bargaining unit, we examine whetherS 8(f) or S 9(a) governs the relationship between the parties in this case. The district court held that the S 8(f) rule requiring an employer's affirmative action to bind it to the multiemployer negotiations does not apply because "Defendant[did] not assert nor [did] the record demonstrate that SMCA [was] comprised exclusively of S 8(f) employers." App., Vol. II at 262A.

On appeal, Herre Bros. claims that the record clearly establishes that the relationship between the parties is governed by S 8(f) because the "SMCA is comprised of employers `engaged primarily in the building and construction industry' " as indicated by 29 U.S.C. S 158(f). Appellant's Br. at 19. Herre Bros. also argues that the court improperly applied the summary judgment standard and viewed evidence and inferences in favor of the Union. The Union responds by asserting that the 1992 agreement itself provides clear proof that the employer, through the SMCA, "expressly recognized [the Union] as the recognized collective bargaining representative under Section 9(a)," even when viewed in a light most favorable to Herre Bros. Appellee's Br. at 25-26.

To determine whether the relationship here is governed by 8(f) or 9(a), we look to federal labor relations law. See Mack Trucks, Inc. v. International Union, UAW, 856 F.2d 579, 591 (3d Cir. 1988). In Deklewa, the Board explained

that "the party asserting the existence of a 9(a) relationship [has the burden] to prove it" because the relationship is presumed to be an 8(f) relationship. Deklewa, 282 N.L.R.B. at 1385 n.41; see also NLRB v. Goodless Elec. Co., 124 F.3d 322, 328 (1st Cir. 1997) ("Unless and until a relationship is proved to be otherwise, a bargaining relationship between a construction industry employer and a union is presumed to be 8(f) rather than 9(a)."); Casale Indus., Inc., 311 N.L.R.B. 951, 952 (1993) ("[T]he Board presumes that parties in the construction industry intend their relationship to be an 8(f) relationship."). Deklewa indicated that a party asserting a 9(a) relationship could overcome the 8(f) presumption by showing that a construction industry employer voluntarily recognized a union based on a clear showing of majority support among the unit employees. See Deklewa , 282 N.L.R.B. at 1387 n.53. Subsequent Board cases have explained that a union can establish a 9(a) relationship from an 8(f) relationship in two ways: "(1) through a Board-certified election, or (2) through an employer's voluntary grant of recognition of the union as the employees' exclusive majority bargaining agent." Goodless Elec., 124 F.3d at 328; see J & R Tile, Inc., 291 N.L.R.B. 1034, 1036 & n.11 (1988) (citing cases).

To satisfy the voluntary recognition option under Goodless Electric, the party asserting the 9(a) relationship must show (1) a clear and unequivocal demand to be recognized as a 9(a) representative, (2) a voluntary and unequivocal grant of such recognition, and (3) a contemporaneous showing of majority support among the appropriate unit of employees. See Golden West Elec., 307 N.L.R.B. 1494, 1495 (1992). "[T]here must be evidence that the union unequivocally demanded recognition as the employees' 9(a) representative and that the employer unequivocally accepted it as such." J & R Tile, 291 N.L.R.B. at 1036.

With respect to the third requirement, Board precedent indicates that the contemporaneous showing of majority support may be satisfied in various ways. For example, the Board has indicated that majority support may be demonstrated through the presentation of employee authorization cards to an employer, see Hayman Elec., Inc.,

11

314 N.L.R.B. 879, 886 (1994), or through an employer-conducted poll prior to initial recognition, see Precision Stripping, Inc., 284 N.L.R.B. 1110, 1112 (1987). In addition, the Board has found the third requirement satisfied where an employer's admission or acknowledgment that the union enjoyed majority support was given contemporaneously with the demand for 9(a) recognition and was provided without inquiry into the union's actual status. See Golden West Elec., 307 N.L.R.B. at 1495 ("The voluntary recognition agreement signed by the Employer by its terms unequivocally states that the Union claimed it represented a majority of the employees and Employer acknowledged that this was so."). In addition, the Board has determined that, by signing a collective bargaining agreement containing contractual language which unequivocally demands and grants 9(a) recognition and states that "the Employer is satisfied that the Union represents a majority of its eligible employees," the employer confers 9(a) status on the union without more. Decorative Floors, Inc., 315 N.L.R.B. 188, 188 (1994); see also Triple C Maintenance, Inc., 327 N.L.R.B. No. 15, 1998 WL 799280, at *6-*7 (N.L.R.B. Oct. 30, 1998) (holding that recognition clause of collective bargaining agreement established that union was exclusive representative of employer's employees based on S 9(a)); MFP Fire Protection, Inc., 318 N.L.R.B. 840, 841-42 (1995) (determining that employer's execution of a document acknowledging 9(a) representative status of the union was sufficient to establish 9(a) relationship, despite absence of other independent proof showing majority status), enforced on other grounds, 101 F.3d 1341, 1343 (10th Cir. 1996).

Similarly, the Board has deemed as sufficient proof a union's claim of majority support that went unchallenged by the employer for more than six months. See Triple A Fire Protection, Inc. 312 N.L.R.B. 1088, 1089 (1993) (applying six-month limitation period to preclude employer from challenging union's majority status approximately four years after employer signed contract recognizing 9(a) relationship), enforced, 136 F.3d 727, 736-37 (11th Cir. 1998); Casale Indus., 311 N.L.R.B. at 953 (refusing to consider employer's challenge to union's majority status six years after employer extended 9(a) recognition and limiting

challenges to union's majority status to six months after employer extends 9(a) status). But see American Automatic Sprinkler Sys., Inc. v. NLRB, 163 F.3d 209, 218 n.6, 222 (4th Cir. 1998) (holding that six-month limitation period does not apply and requiring explicit proof of actual majority status contemporaneous with union's demand and employer's voluntary recognition).

Applying these principles to this case, we presume that the collective bargaining relationship between Herre Bros., the SMCA, and the Union was established under S 8(f). However, we must review the record to determine whether the Union overcame this presumption and whether there are genuine issues of fact on this point.

Viewing the evidence in a light most favorable to Herre Bros., we conclude that the 1992 collective bargaining agreement constitutes uncontroverted proof that the parties were governed by S 9(a). Article II, S 12 of this agreement is a recognition clause. It states:

> Insomuch as[ ] the Union has submitted proof and the Employer is satisfied that the Union represents a majority of its employees in the bargaining unit described herein, the Employer recognizes the Union as the exclusive Collective Bargaining Unit on all present and future job sites within the jurisdiction of the Union, unless and until such time as the Union loses its status as the employees exclusive representative as a result of an N.L.R.B. election requested by the employees. The Employer agrees that it will not request an N.L.R.B. election and expressly waives any right it may have to do so.

App., Vol. I at 136A. This language conclusively establishes a 9(a) relationship for several reasons. First, while the employer does not explicitly demand 9(a) recognition, the intent and the content of the language unequivocally imply such a demand.6 Second, the contract unequivocally states

_____

6. We note that the 1995 collective bargaining agreement contains a substantially identical recognition clause as the 1992 agreement. The later agreement differs in that it explicitly states that "the Union has demanded recognition from the Employer as the exclusive bargaining representative . . . under Section 9(a) . . . and has submitted proof thereof in the form of signed and dated authorization cards." App., Vol. II at 162A.

13

that the employer recognizes the Union as the exclusive majority representative of the employees in the bargaining unit until the Union loses that status by an employee-requested election. Third, although the type of proof is not described, the contract clearly recites that the Union submitted proof and that the employer is satisfied that the union represents a majority of its employees based on that proof. By entering into and signing an agreement containing the above language, the employer confers 9(a) status on the Union. See MFP Fire Protection, 318 N.L.R.B. at 841-42; Decorative Floors, 315 N.L.R.B. at 188-89. Fourth, the contract contemplates continuance of the relationship subject to defeasance by an election challenging the union's majority status. This arrangement comports with the rule under S 9(a) that the union enjoys a presumption of majority status until an employee-requested election challenges that status; this structure is contemplated by S 9(a) to preserve the freedom of employee choice. Cf. Deklewa, 282 N.L.R.B. at 1379-80. We see no reason why proof of a 9(a) relationship necessarily requires reference to S 9(a) itself in the agreement if the language otherwise conclusively gives notice that a 9(a) relationship is intended. Moreover, the language of the 1992 contract in this case appears indistinguishable from the contract language held to be sufficient in Decorative Floors, 315 N.L.R.B. at 188-89, and Golden West Elec., 307 N.L.R.B. at 1495.

It is undisputed that Herre Bros. was a member of the SMCA at the time this contract language was in effect and that it was bound to the 1992 agreement. Thus, even construing the contractual language and inferences therefrom in a light most favorable to Herre Bros., there is simply no way to read an 8(f) relationship into this contract. Herre Bros. presents no facts which either create a genuine issue of fact on this point or allow us to draw any inferences against the inescapable conclusion that a 9(a) relationship governed the parties in this case.

B

We now turn to the question of withdrawal. The district court analyzed whether the employer Herre Bros. had

14

properly withdrawn from the multiemployer bargaining association under S 9(a) standards. The court determined that Herre Bros. timely notified the SMCA and the Union of its revocation of the assignment of its bargaining rights but that the revocation was invalidated because Herre Bros.' subsequent conduct was inconsistent with the revocation. See App., Vol. II at 264A–65A.

On February 13, 1995, the president of Herre Bros., Richard A. McBride, wrote a letter to the SMCA revoking the association's authority to bargain on behalf of Herre Bros. See id. at 254A. As a result, the SMCA sent a letter to the president of the Union, Thomas J. Kelly, explaining that Herre Bros. "[would] not be assigning the Bargaining Authorization to SMCA." Id. at 255A. This letter, dated March 1, 1995, was signed by the president of the SMCA, Mr. Forlizzi. The record shows that at all times relevant to this case, Mr. Forlizzi also was vice-president of sheet metal operations at Herre Bros. See id., Vol. I at 53A. On March 9, 1995, Mr. Kelly sent a letter on behalf of the Union to Herre Bros. in which he admitted receiving notice from the SMCA that Herre Bros. had not given their bargaining rights to the association and he invited Herre Bros. to negotiate separately a new collective bargaining agreement to replace the one expiring on May 31, 1995. See id., Vol. II at 154A.

Meanwhile, the SMCA proceeded to negotiate with the Union, meeting six times between May 15, 1995, and July 18, 1995. Lori A. Eshenaur, executive director of the SMCA, and Mr. Kelly were the principal negotiators. They reached a tentative agreement on June 2, 1995, and although the new agreement was not signed by the parties until July 18, 1995, it was effective retroactively from June 1, 1995, to May 31, 1998. Both the expiring 1992 agreement and the new 1995 agreement contained identical language providing that all members of the association "shall be bound by this Agreement."7 Id., Vol. I at 136A; Vol. II at 162A. If Herre

_____

7. Article II, S 13 of the 1992 and the 1995 agreements states in full:

     The Employer hereby agrees that all of its members, both collectively and individually, shall be bound by this Agreement, just

Bros. failed to effectively withdraw or if its conduct subsequently invalidated a withdrawal, it certainly would be bound to the 1995 agreement by this provision.

Although Herre Bros. and the Union negotiated independently, meeting approximately four times beginning on May 23, 1995, they did not reach an agreement. 8 Toward the end of the negotiation period, on August 30, 1995, Mr. Kelly sent a letter to Ms. Eshenaur indicating that he knew Herre Bros. was still a member of the SMCA and Mr. Forlizzi was still president of the SMCA. The purpose of the letter was to inquire about what actions the SMCA was taking with respect to Herre Bros. and to remind the SMCA that S 13 of the 1995 collective bargaining agreement bound all members of the SMCA to the terms of that agreement. On September 14, 1995, the Union's lawyer sent a letter to counsel for Herre Bros. "requesting that Herre Brothers acknowledge that it is bound to the [1995 collective bargaining agreement] in accordance with the terms of that Agreement[,] . . . their membership in the [SMCA, and] . . . Section 8(a)(5) of the National Labor Relations Act." Id., Vol. II at 230A. The next day Mr. Kelly sent a letter to Herre Bros. stating that the Union expected Herre Bros. to employ all the sheet metal workers beginning September 18, 1995, pursuant to the collective bargaining agreement to which it believed Herre Bros. was bound. The letter was received by Herre Bros. on September 18, 1995. However, on September 19, 1995, Mr. Forlizzi, in his

_____

> as surely as if each and every member signed it and whether or not each does so individually and whether or not membership is retained in the Employer Association party to this Agreement. The Employer, as an Association, through its duly elected officers and representatives hereby declares and affirms that each and every member has so agreed and has authorized the officers and representatives named below to sign this agreement, both for the Association and for each member individually.

App., Vol. I at 136A; Vol. II at 162A.

8. The record indicates that Union workers struck Herre Bros. from August 16, 1995, through September 17, 1995. Because Herre Bros. fails to show the relevance of this strike on the dispute, it has no bearing on our analysis.

16

capacity as vice-president at Herre Bros., wrote the SMCA notifying it of Herre Bros.' immediate withdrawal from the association. See id. at 249A. At this juncture, Herre Bros. refused to be bound by the 1995 agreement.

Generally, "[a]n employer who is a member of a multiemployer bargaining association is bound by an agreement negotiated by the association." NLRB v. Hartman, 774 F.2d 1376, 1383 (9th Cir. 1985) (citing Charles D. Bonanno Linen Service, Inc. v. NLRB, 454 U.S. 404, 412 (1982)). After a multiemployer bargaining arrangement is formed binding its members to a union agreement, the parties' withdrawal is subject to reasonable controls. See Retail Assocs., 120 N.L.R.B. at 393. Absent unusual circumstances or mutual consent, neither employers nor unions may withdraw from multiemployer bargaining arrangements once negotiations for a new contract have commenced. See id. at 395."Prohibiting such withdrawals contributes to the stability of multiemployer units and prevents the use of the scope of the bargaining unit as a bargaining lever to secure an economic advantage for one side over the other." NLRB v. Marine Mach. Works, Inc., 635 F.2d 522, 524 (5th Cir. 1981); see also NLRB v. Sheridan Creations, Inc., 357 F.2d 245, 248 (2d Cir. 1966) ("Withdrawal should be restricted to the period before negotiations to assure that it is not used as a bargaining lever.").

Effective withdrawal from a multiemployer unit must meet three requirements. In Retail Associates, the Board explained that a S 9(a) employer may abandon the multiemployer bargaining unit only if it (1) unequivocally withdraws from the association (2) in a timely fashion before negotiations for a new contract begin (3) by communicating the intent to withdraw to all parties. See Retail Assocs., 120 N.L.R.B. at 393, 395. "The decision to withdraw must contemplate a sincere abandonment, with relative permanency, of the multiemployer unit and the embracement of a different course of bargaining on an individual-employer basis." Id. at 394. Stated differently, an employer may not attempt to "secure the best of two worlds" by purportedly withdrawing bargaining authority but then remaining a member of a multiemployer unit in

17

the hope of securing advantageous terms through group negotiations. Associated Shower Door Co., 205 N.L.R.B. 677, 682 (1973), enforced, 512 F.2d 230, 233 (9th Cir. 1975); accord Michael J. Bollinger Co., 252 N.L.R.B. 406, 407-08 (1980), enforced, 705 F.2d 444 (4th Cir. 1983) (Table); cf. Road Sprinkler Fitters Local Union No. 669/Plumbing and Pipefitting Industry, 318 N.L.R.B. 347, 348 (1995) (distinguishing employer's timely and adequate withdrawal from bargaining association from case where employer "hangs back" to see how bargaining will proceed), enforced, 853 F.2d 918 (3d Cir. 1988) (Table)."Clearly, all parties to collective bargaining need to know with whom they are bargaining and who will be bound by any agreement that is reached." Hartman, 774 F.2d at 1383.

By the exchange of letters in February and March of 1995 between Herre Bros., the SMCA, and the Union, Herre Bros. met the requirements of withdrawal set forth by Retail Associates, 120 N.L.R.B. at 393, 395. Herre Bros. unequivocally notified the association that it was withdrawing its bargaining rights before negotiations for the new 1995 contract began; that intent was communicated to the Union by Mr. Forlizzi on behalf of the SMCA; and the Union acknowledged the revocation of bargaining rights to Herre Bros. We now examine whether Herre Bros.' actions after its revocation invalidated the revocation.

"The Board has often held that an employer's withdrawal from multiemployer bargaining is nullified when its subsequent actions are inconsistent with its stated intent to abandon group bargaining . . . ." See International Ladies' Garment Workers' Union, 286 N.L.R.B. 226, 230 (1987). Certain conduct, therefore, is prohibited to prevent the employer from obtaining the "best of two worlds." Associated Shower Door, 205 N.L.R.B. at 682; accord Trustees of the Carpenters Health & Welfare Trust Fund v. Universal Constr. Servs., 695 F. Supp. 554, 564 (S.D. Fla. 1988) ("Defendant may not attempt to seek the`best of two worlds' by attempting to assert that his obligations have terminated while continuing to reap the benefits of hiring and employing Union members, and continuing to conduct itself as though it were bound under the agreement.").

18

The Board's jurisprudence in this area is governed largely by the factual particularities of each case. Nonetheless, two principles have emerged. First, the Board has decided that an employer's continued membership in a multiemployer association after revoking bargaining rights is not necessarily inconsistent with the intent to revoke bargaining rights. See Ladies' Garment Workers' , 286 N.L.R.B. at 230 ("[T]he fact that an employer does not resign from the multiemployer association is not inconsistent with withdrawal . . . from multiemployer bargaining."); Walt's Broiler, 270 N.L.R.B. 556, 557–58 (1984) (holding that employers' continued membership in multiemployer association "[did] not negate the clear and unequivocal intent" not to be bound to a multiemployer agreement); cf. Patterson–Stevens, 316 N.L.R.B. at 1286 (finding that S 8(f) employer did not act in manner inconsistent with withdrawal from multiemployer bargaining despite fact that it did not terminate membership in association and it continued to serve on association's board of directors). Thus, while Herre Bros. did not withdraw completely from the SMCA until September 19, 1995, well after the bargaining had begun and concluded, its continued membership in the association after revocation did not necessarily contradict its intent to revoke bargaining rights.

Second, the Board and the courts have stated that an employer may be bound to a multiemployer agreement, even after effecting a timely withdrawal from an association, by continuing to participate actively in the association's negotiations and continuing to observe membership obligations such as paying dues to the association. See, e.g., Dependable Tile Co., 268 N.L.R.B. 1147, 1147 (1984) (holding that employer nullified its withdrawal from multiemployer bargaining by renewing its membership in the association and participating actively in group negotiations for a new contract), enforced Hartman, 774 F.2d at 1384–85; Bollinger, 252 N.L.R.B. at 407 (determining that employer's pattern of sending withdrawal letters to the union while attending and participating in multiemployer bargaining did not constitute effective withdrawal); Associated Shower Door, 205 N.L.R.B. at 682 (finding withdrawal ineffective in part because employers'

19

subsequent participation in multiemployer negotiations retracted or nullified any withdrawal).9  Even where the Board found that withdrawal was effective and was not invalidated, it suggested that an employer may nullify its withdrawal "by attempting to secure favorable terms in [a] new multiemployer . . . agreement, while reserving[the] right to reject any agreement [it] did not like." See Ladies' Garment Workers', 286 N.L.R.B. at 231. Accordingly, even though continued membership in a multiemployer bargaining association is not necessarily inconsistent with revocation, it can be made inconsistent by too active participation in the association or in the association's negotiations with a union.

The record here shows that Mr. Forlizzi remained president of the SMCA after timely withdrawing Herre Bros.' bargaining rights from the association, during the negotiations between the SMCA and the Union for the 1995 contract, and until Herre Bros. completely withdrew from the association on September 19, 1995.10  The record also reveals that Mr. Forlizzi was present at and participated in the individual negotiations with the Union on behalf of Herre Bros. We examine Mr. Forlizzi's actions in these capacities between March 9, 1995, the date on which the Union admitted receiving notice of Herre Bros.' revocation of its bargaining rights from the SMCA, and September 19, 1995, the date on which Herre Bros. withdrew its membership from the association, to determine their impact on the question of withdrawal.

_____

9. Generally, when withdrawal or revocation is "ineffective," this means that the employer failed to satisfy the Retail Associates requirements of unequivocal withdrawal by timely communicating the intent to withdraw to all parties before negotiations for a new contract begin. See Retail Assocs., 120 N.L.R.B. at 393, 395. When withdrawal or revocation is "nullified," the employer has acted in a manner inconsistent with the intent to withdraw. While some courts confuse this distinction, it is really a false distinction because the end result is the same: The employer is bound to the collective bargaining agreement.

10. By a check dated July 28, 1995, after the new 1995 contract had been signed by the SMCA and the Union, Herre Bros. paid its dues to the SMCA, thereby renewing its membership in the association.

On April 11, 1995, Mr. Forlizzi attended a meeting of the Board of Directors of the SMCA. In his deposition, Mr. Forlizzi admitted that he discussed the fact of upcoming Union renegotiations at the meeting but stated that he did not discuss the terms or conditions of the contract. On three subsequent occasions, however, May 15, May 23, and June 15, 1995, Mr. Forlizzi received information by fax from Ms. Eshenaur concerning the negotiations between the Union and the SMCA which included contract particulars.[11] See App., Vol. I at 69A–76A, 101A; Vol. II at 200A, 217A. Mr. Forlizzi admitted in his deposition that he requested this information for the purpose of sharing information and that, "as a matter of policy, the head of the negotiating committee[, not the president of the SMCA,] would have been the one to receive all this correspondence." Id., Vol. I at 73A–74A. Specifically, the items Mr. Forlizzi requested to be faxed to him included SMCA–Union contract proposals, see id., Vol. II at 200A–08A, synopses of negotiations between the Union and the SMCA, see id., Vol. I at 74A–75A, and final contract changes and wage rates, see id., 75A–76A; Vol. II at 217A–23A. In addition to receiving negotiating information by fax, Mr. Forlizzi admitted to three to six phone conversations with Ms. Eshenaur and one phone conversation with William Sponaugle, Chairman of the SMCA negotiating committee, in which they discussed the terms of the agreement between the Union and the SMCA, see id., Vol. I at 101A–02A, 104A, 106A, and "what [the Union] was asking for and what SMCA was offering." Id. at 69A. Ms. Eshenaur testified that Mr. Forlizzi asked for the information on the negotiations and that she sent it because both the SMCA and Herre Bros. were in negotiations with the Union. See id. at 104A. Finally, Ms. Eshenaur also stated that Mr. Forlizzi attended a meeting with her and counsel for the SMCA concerning one of the contract clauses in negotiation. See id. at 107A–08A.

Without drawing any inferences, we think this evidence speaks for itself. The evidence shows that after Herre Bros.

_____

11. The record also shows that, on May 22, 1995, Mr. Forlizzi sent a fax concerning the SMCA–Union negotiations to Tom Davies, counsel for Herre Bros.

21

revoked its bargaining rights Mr. Forlizzi sought out information from the SMCA-Union negotiations and discussed the details of that bargaining with at least two SMCA people directly involved in the negotiations. Although Mr. Forlizzi did not actually attend or participate in bargaining sessions between the SMCA and the Union, it is clear from the record that he did participate in the negotiations through his discussions with Ms. Eshenaur and Mr. Sponaugle. Moreover, the fact that Mr. Forlizzi sought information concerning the terms of the SMCA-Union negotiations at the same time that he also was negotiating with the Union on behalf of Herre Bros. demonstrates that he intended to use that information either for his own bargaining purposes on behalf of Herre Bros. or to improve the bargain for the SMCA in his role as its president. From this evidence, together with Ms. Eshenaur's testimony confirming Mr. Forlizzi's statements, we conclude that Mr. Forlizzi's conduct was inconsistent with Herre Bros.' revocation of bargaining rights. Moreover, the record does not create any genuine issues of fact regarding this point. Even drawing all inferences in favor of Herre Bros., there is no way around the fact that Mr. Forlizzi obtained information from the SMCA-Union negotiations to which he was privy and took advantage of the benefits of multiemployer bargaining to secure the best terms either for Herre Bros. or for the SMCA. Either way, he was engaging in the very sort of conduct that Associated Shower Door, 205 N.L.R.B. at 682, counseled against.12 See Bollinger, 252 N.L.R.B. at 407-08. We therefore conclude that the district court did not err in finding that Mr. Forlizzi's conduct subsequent to the notice of revocation nullified the revocation because it was inconsistent with Herre Bros.' stated intent to abandon group bargaining and negotiate independently.

_____

12. Mr. Forlizzi's ex-officio membership in the SMCA Negotiating Committee, see App., Vol. I at 43A, does not show conduct inconsistent or consistent with Herre Bros.' stated intent to abandon multiemployer bargaining. It is only Mr. Forlizzi's actual conduct in relation to the SMCA and the Union that invalidates Herre Bros.' revocation of bargaining rights.

Although we have determined that the district court did not err in finding that Herre Bros. nullified its revocation of bargaining rights, we briefly examine whether the Union acquiesced to Herre Bros.' nullification of its revocation. If the Union acquiesced, the revocation remains operative. See, e.g., Associated Shower Door, 205 N.L.R.B. at 681.

Usually, courts examine whether a union has acquiesced or consented to an employer's withdrawal in situations where the withdrawal was apparently ineffective because it was untimely. See, e.g., Reliable Roofing Co., 246 N.L.R.B. 716, 717 (1979) (concluding that union did not clearly intend to acquiesce to employer's withdrawal from ongoing multiemployer bargaining); Associated Shower Door, 205 N.L.R.B. at 681 (questioning whether union acquiesced to employer's attempted withdrawal after negotiations had commenced). In this case, Herre Bros. seems to argue that their revocation of bargaining rights trumps any conduct that may have nullified the revocation because the Union acquiesced to that conduct.

A union may acquiesce to an employer's withdrawal in several manners, including initiating individual bargaining with the employer, listening to the employer's counteroffers, and offering terms or conditions to the employer that are more favorable than those proposed to the multiemployer association. See Associated Shower Door, 205 N.L.R.B. at 681. In this case, the Union initiated separate bargaining with the employer, but both parties agree that it did not offer more favorable terms or conditions to the employer. See App., Vol. II at 226A; Appellant's Br. at 25. These facts alone do not answer whether the Union acquiesced.

Another consideration relevant to the question of acquiescence is when the Union learned that Herre Bros. was a member of the SMCA and that Mr. Forlizzi was still its president. The SMCA executive director, Ms. Eshenaur, testified that Herre Bros.' continuing membership in the association and Mr. Forlizzi's presidency were discussed at several negotiating sessions with the Union between May and July 1995. See App., Vol. I at 110A–11A, 114A. Union president and negotiator Mr. Kelly stated that he did not know prior to the negotiations that Herre Bros. remained a member of the SMCA or that Mr. Forlizzi was still president

23

of the association, see id., Vol. II at 224A, and that no SMCA representative informed the Union of these facts until the end of August 1995. See id. at 225A–26A. The notice sent by the SMCA to the Union indicating that Herre Bros. no longer assigned bargaining rights to the association did not mention Herre Bros.' continued membership in the association, nor did it say anything about Mr. Forlizzi continuing as president of the SMCA. See id. at 255A. These differing testimonies reflect that questions of fact exists about when the Union knew that Herre Bros. remained a member of the SMCA and that Mr. Forlizzi was still the president of the association, but we conclude that they are immaterial fact questions based on the following reasoning. It is undisputed that at the time of the negotiations in 1995 between the Union and the SMCA and between the Union and Herre Bros. the Union was unaware of Mr. Forlizzi's attempts to obtain information regarding the SMCA–Union negotiations; it did not know that the SMCA and Herre Bros. had shared information in this manner. More importantly, Mr. Kelly operated under the belief, which is not disputed by Herre Bros., that the Union's negotiations with Herre Bros. were supposed to be separate and independent from those with the SMCA. See id. at 225A–26A. Because a union's acquiescence to withdrawal is predicated on the notion that the withdrawing employer will negotiate independently and without attempting to secure terms to its satisfaction by accessing multiemployer bargaining information, we conclude that the Union in this case could not have acquiesced to Herre Bros.' revocation regardless of when it learned of Herre Bros.' status in the association and Mr. Forlizzi's position as president.

We hold that, while an employer may remain a member of a multiemployer association to obtain benefits other than multiemployer bargaining, by revoking bargaining rights the employer must forgo the advantages of multiemployer bargaining. Cf. Bonanno Linen, 454 U.S. at 420 (Stevens, J., concurring). An employer cannot both utilize the advantages of multiemployer bargaining and revoke bargaining rights so as to avoid being bound to a multiemployer agreement. We adopt the Fifth Circuit's and the Board's stated policy which prohibits using withdrawal

24

from multiemployer bargaining as a bargaining lever. See
Marine Mach. Works, 635 F.2d at 524; Associated Shower
Door, 205 N.L.R.B. at 682.

Mr. Forlizzi's admission that he requested and used
information from the SMCA to compare the negotiations,
that such information was not sent to him in his capacity
as president of the SMCA, and Ms. Eshenaur's confirmation
of these statements show only that Herre Bros. did not
abandon the advantages of group bargaining. Because we
conclude that Mr. Forlizzi's conduct was inconsistent with
Herre Bros.' stated intent to revoke its bargaining rights
and therefore invalidated the revocation, and because the
Union did not acquiesce to the nullification of the
revocation, we hold that the district court did not err in
concluding that Herre Bros. is bound to the 1995
agreement between the Union and the members of the
SMCA under S 13 of that agreement.

IV

The question remains whether the district court properly
granted the Union specific performance of the 1995
agreement. Herre Bros. argues that the district court
should not have granted specific performance for two
reasons: (1) the Union's request for specific performance
was unspecified until after trial and therefore untimely; and
(2) the equitable remedy was not necessary because the
district court was capable of determining the legal measure
of damages, as evidenced by its order filed August 27,
1997.

In its amended complaint, the Union requested money
damages representing lost wages and fringe benefits, a
declaratory judgment, and "[s]uch other relief as the Court
deems just and reasonable." App., Vol. II at 284A. We have
held that "Rule 8(a)(3) of the Federal Rules of Civil
Procedure does not require that the demand for judgment
be pled with great specificity." Sheet Metal Workers Local 19
v. Keystone Heating & Air Cond., 934 F.2d 35, 40 (3d Cir.
1991). As a result, we believe that the request for relief in
the amended complaint is broad enough to encompass a
request for specific performance, especially in light of the

25

actual request made in a post-trial brief.13 For this reason and because a trial court is required to "grant the relief to which the party in whose favor it is rendered is entitled, even if the party has not demanded such relief in the party's pleadings," Fed. R. Civ. P. 54(c), we cannot say that the Union's request for specific performance was untimely or otherwise improper.

We now turn to the second argument. While this court has not explicitly stated its standard for reviewing decisions granting or denying specific performance, we have suggested that we use a discretionary standard. See Castle v. Cohen, 840 F.2d 173, 178 (3d Cir. 1988) (stating that "a court of equity may, in its discretion, grant specific performance"); First Nat'l State Bank v. Commonwealth Fed. Sav. & Loan Ass'n, 610 F.2d 164, 174 (3d Cir. 1979) (holding that trial judge's decision to grant specific performance, which placed substantial hardship on one party, was not an abuse of discretion). Because the equitable remedy of specific performance is not a matter of absolute right but rests within the sound discretion of the court, we review the district court's decision to grant specific performance for an abuse of discretion. Accord Medcom Holding Co. v. Baxter Travenol Lab., Inc., 106 F.3d 1388, 1403 (7th Cir. 1997) (reviewing grant of specific performance for an abuse of discretion); Walser v. Toyota Motor Sales, U.S.A., Inc., 43 F.3d 396, 403 (8th Cir. 1994) (same); Koch v. Koch, 903 F.2d 1333, 1335 (10th Cir. 1990) (same); Klein v. PepsiCo, Inc., 845 F.2d 76, 78 (4th Cir. 1988) (same); Trans Union Credit Info. Co. v. Associated Credit Servs., Inc., 805 F.2d 188, 193 & n.6 (6th Cir. 1986) (same); Leasco Corp. v. Taussig, 473 F.2d 777, 786 (2d Cir. 1972) (same). A court may grant specific performance if there is no adequate remedy at law. See Castle, 840 F.2d at

_____

13. Although Herre Bros. did not provide the court with a copy of the Union's post-trial brief in the record, both parties agree that the Union's
post-trial brief, which was filed after the conclusion of the November 1996 bench trial on damages, see App., Vol. II at 271A; Attach. to Appellant's Br. (Order filed Nov. 20, 1996), contained a request for specific performance. Herre Bros. filed a responsive memorandum objecting to the request for specific performance. See App., Vol. II at 278A.

26

178 (citing Portnoy v. Brown, 243 A.2d 444, 446 (Pa. 1968)); Kroblin Refrigerated Xpress, Inc. v. Pitterich, 805 F.2d 96, 103 (3d Cir. 1986). We exercise plenary review to determine whether there is an adequate remedy at law. See Kroblin, 805 F.2d at 103.

In any suit seeking specific performance, a grant of equitable relief is available only as a substitute in "the absence of an adequate remedy at law." Dairy Queen, Inc. v. Wood, 369 U.S. 469, 478 (1962). Generally, the legal remedy is inadequate in only two situations:

> (1) where damages would be insufficient because the subject matter of the contract is of such a special nature that it resists translation into quantitative terms--the damage remedy would not be a just and reasonable substitute for or representative of that subject-matter in the hands of the party who is entitled to its benefit; or (2) where damages are impracticable because it is impossible to arrive at a legal measure of damages at all, or at least with any sufficient degree of certainty.

First Nat'l State Bank, 610 F.2d at 171 (quotation marks and citations omitted); see also Girard Bank v. John Hancock Mut. Life Ins. Co., 524 F. Supp. 884, 888 n.1, 895–96 (E.D. Pa. 1981) (applying First National State Bank reasoning to analysis of specific performance under Pennsylvania law and ordering specific performance), aff'd, 688 F.2d 820 (3d Cir. 1982) (Table).

We can see nothing unusually special about the nature of the 1995 agreement that would make damages insufficient if they were reduced to quantitative terms. See First Nat'l State Bank, 610 F.2d at 171. The record shows that after a trial on the damages in this case the district court calculated several different measures of damages. Itfirst determined that the Union was entitled to $12,577.00 for Herre Bros.' "failure to pay union members in accordance with the 1995 contract for work performed after May 31, 1995." App., Vol. I at 19A. The court then held that lost wages are not a proper element of damages, see id. at 27A, and it calculated the amount recoverable for work performed by nonunion workers. For two periods of time,

27

from June 1, 1995, through May 31, 1996, and from June 1, 1996, through September 27, 1996, the court calculated damages for "straight time" and overtime work performed by nonunion workers, for a total of $269,181.32. Id. at 28A. Third, the court awarded uncontested liquidated damages in the amount of $43,445.66. Finally, in response to the Union's request for an accounting of damages for work performed by nonunion workers after September 27, 1996, the court directed Herre Bros. to provide the Union with an accounting of hours worked by nonunion workers between September 27, 1996, and the date of the court's Order, August, 27, 1997. See id. at 12A, 31A. The court instructed the Union that it could file a supplemental brief on this issue and permitted Herre Bros. to file a reply brief.14

It is not erroneous as a matter of law to award both damages and specific performance. See First Nat'l State Bank, 610 F.2d at 174 (stating that award of incidental damages in addition to specific performance award was not improper). Here, the district court calculated damages up to the time of its order and concluded that the best way to deal with damages from the date of its order to the end of the collective bargaining agreement (from August 27, 1997, to May 31, 1998) was to order specific performance of the agreement. As evidenced by the court's need to order an accounting and further briefing from the parties for damages from the date that discovery was concluded, September 27, 1996, to the date of its order, August 27, 1997, it is reasonable to conclude that calculating damages for the period from August 27, 1997, to the end of the 1995 agreement, May 31, 1998, would have been impracticable at best. Because a period of time remained in the 1995 agreement at the time the district court filed its August 27, 1997 Order and Memorandum, there was no way it could have calculated "with any sufficient degree of certainty" how many contracts Herre Bros. would have and how many employees it would require. Id. at 171. Thus, based on the uncertainty of Herre Bros.' future amount of work, we conclude that damages were impracticable and there was

_____

14. With respect to damages for work that was subcontracted by Herre Bros. after June 1, 1995, the court held that the Union had not met its burden of establishing this type of damages.

28

no adequate remedy at law for the period of time remaining in the 1995 agreement. On the basis of this conclusion, we hold that the district court did not abuse its discretion in ordering specific performance.

We AFFIRM the district court's order of specific performance.

A True Copy:
Teste:

      Clerk of the United States Court of Appeals
      for the Third Circuit

29