**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**GOODLESS ELECTRIC CO., INC., Respondent.**

No. 96–2068.

United States Court of Appeals, First Circuit.

Heard May 9, 1997.

Decided Sept. 5, 1997.

Jay M. Presser, Springfield, MA, with whom Skoler, Abbott & Presser, P.C., was on brief, for respondent.

Susan M. Pavsner, Attorney, Washington, DC, with whom Frederick L. Feinstein, General Counsel, Linda Sher, Associate General Counsel, Aileen A. Armstrong, Deputy Associate General Counsel, and Howard E. Perlstein, Deputy Assistant General Counsel, National Labor Relations Board, were on brief, for petitioner.

Before TORRUELLA, Chief Judge, BOWNES, Senior Circuit Judge, and LYNCH, Circuit Judge.

TORRUELLA, Chief Judge.

In February 1994, Local Union No. 7 of the International Brotherhood of Electrical Workers, AFL–CIO ("Union") filed charges of unfair labor practices with the National Labor Relations Board ("NLRB" or "Board") against Defendant–Cross–Petitioner Goodless Electric Co. ("Goodless"). On March 2, 1995, an administrative law judge ("ALJ") issued a decision finding no labor violations and recommending dismissal of the charges. The NLRB General Counsel appealed to a panel of the NLRB, which, on April 30, 1996, reversed certain of the ALJ's findings as they relate to the issues relevant to this appeal and determined that Goodless had violated provisions of the National Labor Relations Act ("NLRA" or "Act"). *See Goodless Elec. Co.*, 321 N.L.R.B. 64 (1996). Before us are the Board's petition for enforcement of its order and Goodless' petition for reversal of the Board's conclusions of law. For the reasons stated herein, we reverse and deny the Board's petition for enforcement of its order.

## BACKGROUND

The background facts are essentially undisputed. Goodless is a construction industry employer engaged in electrical contracting. In June 1988, Goodless agreed to be bound by an existing collective bargaining agreement between the multi-employer National Electrical Contractors Association ("NECA") and the Union. In July 1990, Goodless became a signatory to a new three-

year collective bargaining agreement between the NECA and the Union. The agreement authorized the NECA to bargain with the Union on Goodless' behalf unless that authority was withdrawn with 150 days' notice of cancellation. The relationship entered into by Goodless and the Union at this point constituted a Section 8(f)[1] relationship under the NLRA. Under Section 8(f), a construction industry employer may enter into a relationship with a union whereby the union bargains on behalf of the employer's employees prior to a showing that the union has garnered the support of a majority of the employees. The question on which the issues in this appeal hinge relates to the circumstances under which a Section 8(f) relationship may become a Section 9(a)[2] relationship. Under Section 9(a), once a union has become the representative of a majority of the employees in an appropriate bargaining unit, the employer is required to bargain with the union as the employees' bargaining representative. The NLRB has held that Section 8(f) status may change to Section 9(a) status by virtue of either a Board-certified election or as the result of the employer's voluntary recognition of the union as the majority collective bargaining agent. Voluntary recognition requires the union's unequivocal demand for, and the employer's unequivocal grant of, voluntary recognition as the employees' collective bargaining representative based on the union's contemporaneous showing of majority employee support. *See James Julian, Inc.,* 310 N.L.R.B. 1247, 1252 (1993).

On June 18, 1992, Goodless notified NECA and the Union that NECA was no longer authorized to negotiate on Goodless' behalf and that Goodless did not intend to be bound by any further contractual modifications or obligations beyond the then-current agreement's expiration date of June 30, 1993. Thus, Goodless indicated that any relationship between Goodless and the Union would expire as of June 30, 1993.

In July 1992, a Union representative contacted Goodless' president and indicated that Goodless would need to sign a letter of assent.[3] Goodless was told that the letter of assent was needed in order for Goodless to continue receiving "target money."[4] Goodless' president reviewed the letter of assent and deleted some language contained in the

1. Section 8(f) of the Act, 29 U.S.C. § 158(f) (1976), provides:

   It shall not be an unfair labor practice under subsections (a) and (b) of this section for an employer engaged primarily in the building and construction industry to make an agreement covering employees engaged (or who, upon their employment, will be engaged) in the building and construction industry with a labor organization of which building and construction employees are members (not established, maintained, or assisted by any action defined in subsection (a) of this section as an unfair labor practice) because (1) the majority status of such labor organization has not been established under the provisions of section 159 of this title prior to the making of such agreement, or (2) such agreement requires as a condition of employment, membership in such labor organization after the seventh day following the beginning of such employment or the effective date of the agreement, whichever is later.... Provided, That nothing in this subsection shall set aside the final proviso to subsection (a)(3) of this section: Provided further, That any agreement which would be invalid, but for clause (1) of this subsection, shall not be a bar to a petition filed pursuant to section 159(c) or 159(e) of this title.

2. Section 9(a), 29 U.S.C. § 159(a), provides:

   Representatives designated or selected for the purposes of collective bargaining by the majority of the employees in a unit appropriate for such purposes, shall be the exclusive representatives of all the employees in such unit for the purposes of collective bargaining in respect to rates of pay, wages, hours of employment, or other conditions of employment: Provided, That any individual employee or a group of employees shall have the right at any time to present grievances to their employer and to have such grievances adjusted, without the intervention of the bargaining representative, as long as the adjustment is not inconsistent with the terms of a collective-bargaining contract or agreement then in effect: Provided further, That the bargaining representative has been given opportunity to be present at such adjustment.

3. The 1988 NECA agreement required employer-members to sign a letter of assent to be bound by the NECA agreement. Goodless did not sign a letter of assent until 1992; this is the letter at issue here.

4. Target money was financial assistance provided by the Union to aid union employers in competition with non-union electrical contractors.

letter. He did not, however, alter the following language:

> The Employer agrees that if a majority of its employees authorize the Local Union to represent them in collective bargaining, the Employer will recognize the Local Union as the NLRA Section 9(a) collective bargaining agent for all employees performing electrical construction work within the jurisdiction of the Local Union on all present and future jobsites.

Goodless signed the letter of assent on July 15, 1992.

At a meeting with Union representatives on June 22, 1993, Goodless' president again indicated that Goodless did not intend to continue its relationship with the Union after June 30, 1993. The Union representatives encouraged Goodless to consider changes regarding service work that NECA had accepted earlier that month. The meeting ended with the participants agreeing to meet on June 25.

On June 24, the Union's business agent, Douglas Bodman ("Bodman"), held a meeting of all Goodless employees. At this meeting, he indicated the progress of negotiations with Goodless. After informing the employees of Goodless' claim that the Union lacked employee support, he asked the employees to sign authorization cards as evidence of their desire for continued representation. All employees signed the cards, which stated:

> I authorize Local Union No. 7 of the International Brotherhood of Electrical Workers to represent me in collective bargaining with my present and future employers on all present and future jobsites within the jurisdiction of the Union. This authorization is non-expiring, binding and valid until such time as I submit a written revocation.

At the second meeting, on June 25, between Goodless and the Union, Goodless maintained that the company's relationship with the Union would end with the expiration of the agreement. In response, Bodman presented the authorization cards signed by all Goodless employees. Goodless' president tossed the cards back at Bodman, telling him that he could "shove them up [his] ass." Another Union representative calmed ten-

sions and secured from Goodless a six-month extension of the 1990–1993 contract by promising certain terms for Goodless.

On December 13, Goodless informed the Union that it intended to withdraw recognition of the Union upon the approaching December 31 expiration date. On December 17, Goodless sent a letter to all employees indicating these intentions and inviting the employees to discuss the matter with Goodless management prior to December 23.

On December 21, the Union responded with two letters reminding Goodless of the language contained in the letter of assent that bound Goodless to recognize the Union as the Section 9(a) collective-bargaining representative on a showing of majority support and indicating that, the Union having made such a showing at the June 25 meeting, the Union was now the Section 9(a) bargaining representative and Goodless could not repudiate the relationship or negotiate directly with its employees.

Union Business Manager Bodman composed a form letter for the employees to send to Goodless in response to Goodless' December 17 letter. All but one Goodless employee signed and submitted this form letter, which stated in relevant part:

> I intend to continue my employment with Goodless Electric and maintain my membership with [the Union]. I expect you to continue to comply with my union contract and maintain the current wages and terms and conditions of employment.
>
> If you need to discuss any matter concerning wages or terms and conditions of employment, contact my Union Representative Douglas Bodman.

On December 30, Goodless announced new terms of employment to take effect January 1, 1994. On January 1, Goodless also ceased to recognize the Union as the employees' collective bargaining agent.

Because Goodless was no longer a signatory to the NECA agreement, the apprentices working for Goodless were informed by the Joint Apprentice Training Committee

(JATC)[5] on January 6, 1994, that they would be subject to termination from the apprenticeship program if they continued to work for Goodless. As a result, the apprentices terminated their employment with Goodless en masse.

As a result of these unilateral modifications, the Union filed charges of unfair labor practices with the NLRB, alleging that the relationship between the Union and Goodless had been transformed from a Section 8(f) relationship into a Section 9(a) relationship upon the Union's showing of majority support in June 1993. Because the relationship was allegedly one under Section 9(a), the Union argues that Goodless was obligated to and bargain with it as the employees' representative. The Union contends that by withdrawing recognition of the Union as the employees' collective bargaining agent and unilaterally changing the terms and conditions of employment, Goodless violated Section 8(a)(5)[6] of the National Labor Relations Act. The Union also insists that Goodless constructively discharged the apprentices in violation of Section 8(a)(3).[7]

The case was first heard before an ALJ, who determined that the relationship between Goodless and the Union did not change to a Section 9(a) relationship. Because the relationship remained a Section 8(f) relationship, Goodless remained free to repudiate the relationship at the end of the contractual term and thus its unilateral changes to the terms and conditions of employment did not violate either Section 8(a)(3) or Section 8(a)(5).

The NLRB reversed the ALJ's opinion in ruling that, under existing NLRB case law, the relationship between Goodless and the Union changed from a Section 8(f) relationship to a Section 9(a) relationship upon the Union's presentation to Goodless of the employee-signed authorization cards. The Board held that the letter of assent signed by Goodless in June 1992, in which it stated that, should the Union garner majority support, Goodless would recognize the Union as the Section 9(a) employee representative, amounted to a standing promise to extend such recognition conditioned only on the Union's showing of majority support. When the Union showed majority support through the authorization cards in June 1993, the Board

5. Under the NECA collective-bargaining agreement, the Joint Apprentice Training Committee ran an apprenticeship program consisting of three members of the Union and three members of the contractors' association. To be eligible to train apprentices, an employer had to "be signatory to and meet the qualifying requirements as set forth in the basic labor agreement and provide the necessary work experience for training."

6. Section 8(a)(5), 29 U.S.C. § 158(a)(5), provides:
It shall be an unfair labor practice for an employer—
(5) to refuse to bargain collectively with the representatives of his employees, subject to the provisions of section 159(a) of this title.

7. Section 8(a)(3), 29 U.S.C. § 158(a)(3), provides:
It shall be an unfair labor practice for an employer—
(3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization: Provided, That nothing in this subchapter, or in any other statute of the United States, shall preclude an employer from making an agreement with a labor organization (not established, maintained, or assisted by any action defined

in this subsection as an unfair labor practice) to require as a condition of employment membership therein on or after the thirtieth day following the beginning of such employment or the effective date of such agreement, whichever is the later, (i) if such labor organization is the representative of the employees as provided in section 159(a) of this title, in the appropriate collective-bargaining unit covered by such agreement when made, and (ii) unless following an election held as provided in section 159(e) of this title within one year preceding the effective date of such agreement, the Board shall have certified that at least a majority of the employees eligible to vote in such election have voted to rescind the authority of such labor organization to make such an agreement: Provided further, That no employer shall justify any discrimination against an employee for nonmembership in a labor organization (A) if he has reasonable grounds for believing that such membership was not available to the employee on the same terms and conditions generally applicable to other members, or (B) if he has reasonable grounds for believing that membership was denied or terminated for reasons other than the failure of the employee to tender the periodic dues and the initiation fees uniformly required as a condition of acquiring or retaining membership.

reasoned, the condition had been met and Goodless was bound by its earlier promise to recognize the Union as the Section 9(a) employee representative. The Board then found violations of Section 8(a)(3) for Goodless' withdrawal of recognition of the Union and of Section 8(a)(5) for constructive discharge of the four apprentices. The Board ordered Goodless to cease and desist, and also ordered that Goodless: recognize the Union as the exclusive bargaining agent of its journeymen electricians and apprentices; rescind changes in employment terms made on and after December 31, 1993; and make whole all employees who worked for it on and after December 31, 1993, for any loss of wages and other benefits suffered with interest, make whole any fringe benefit funds, and reimburse employees for any losses or expenses they may have incurred because of Goodless' failure to make payments to those funds. Finding that the NLRB misapplied its own precedent in this case, we deny enforcement of its order.

## STANDARD OF REVIEW

▮ We determine whether the Board's decision correctly applies the law and whether it is supported by substantial evidence on the record. *See Yesterday's Children, Inc. v. NLRB,* 115 F.3d 36, 44 (1st Cir.1997); *see also Universal Camera Corp. v. NLRB,* 340 U.S. 474, 488, 71 S.Ct. 456, 464–65, 95 L.Ed. 456 (1951). "We must sustain inferences that the Board draws from the facts and its application of statutory standards to those facts and inferences as long as they are reasonable." *NLRB v. LaVerdiere's Enter.,* 933 F.2d 1045, 1050 (1st Cir.1991). The standard is quite deferential, and does not allow us to displace the Board's choice between two conflicting views merely because we may "justifiably have made a different choice had the matter been before [us] *de novo.*" *Universal Camera Corp.,* 340 U.S. at 488, 71 S.Ct. at 465. This standard, however, is no rubber stamp: We must set aside a Board decision if we cannot fairly find that it is either supported by substantial evidence in the record, *id.,* or correctly applies the relevant law, *Shaw's Supermarkets v. NLRB,* 884 F.2d 34, 35–37 (1st Cir.1989); *see also LaVerdiere's Enter.,* 933 F.2d at 1050 ("The

courts of appeals are charged with 'responsibility for the reasonableness and fairness of Labor Board decisions,' and a court must set aside Board action when it 'cannot conscientiously find that the evidence supporting that decision is substantial, when viewed in the light the record in its entirety furnishes, including the body of evidence opposed to the Board's view.'" (citations omitted) (quoting *Universal Camera Corp.,* 340 U.S. at 488, 490, 71 S.Ct. at 465, 466)).

## DISCUSSION

### I. Statutory structure

Section 9(a), 29 U.S.C. § 159(a), of the National Labor Relations Act designates the manner in which a union becomes the exclusive bargaining representative of a unit of employees. A representative selected by a majority of the employees in a unit, to which the section applies, shall be the employees' exclusive bargaining representative. *See* 29 U.S.C. § 159(a). Generally, it is a violation of Section 8(a) of the NLRA for an employer to treat a union as the exclusive bargaining representative of its employees prior to that union's being designated as such by a majority of the employees. *See* 29 U.S.C. § 158(a) & (f).

The construction industry, however, tends to employ workers for short durations and on discrete projects, making the designation or selection of a union representative difficult. *See generally* S.Rep. No. 86–187 (1959). To remedy this problem and allow construction workers collective bargaining representation, Congress enacted Section 8(f) of the NLRA. *See id.* Section 8(f) essentially provides an exception to the prohibitions on employer recognition of a non-majority representative in the construction industry. Section 8(f) allows a construction industry employer to enter into a specific agreement of limited duration with a union whereby the union acts as the employees' collective bargaining agent. *See* 29 U.S.C. § 158(f). Employees are allowed, however, to petition for the selection of a different agent as their representative. *Id.*

## II. Board precedent

Prior to the Board's decision in *John Deklewa & Sons, Inc.,* 282 N.L.R.B. 1375, 1987 WL 90249 (1987), Board precedent held that a Section 8(f) relationship could change to a Section 9(a) relationship under the "conversion doctrine." The conversion doctrine required only a union's showing of majority support at some point during the relevant period to convert a Section 8(f) relationship into a Section 9(a) relationship. "The achievement of majority support required no notice, no simultaneous union claim of majority, and no assent by the employer to complete the conversion process." *Id.* 282 NLRB at 1378. Upon such conversion, the employer was required under Section 9(a) to recognize the union as the employees' exclusive bargaining agent. *Id.* 282 NLRB at 1379. The conversion created an irrebuttable presumption of majority status for the duration of the agreement. *Id.*

Along came *Deklewa,* however, in which the Board overturned its "conversion doctrine," on the ground that it did not serve the "statutory objectives of employee free choice and labor relations stability." *Id.* In its place, the Board established four cardinal principles to govern this area:

(1) a collective-bargaining agreement permitted by Section 8(f) shall be enforceable through the mechanisms of Section 8(a)(5) and Section 8(b)(3); (2) such agreements will not bar the processing of valid petitions [for a Board-certified election] filed pursuant to Section 9(c) and Section 9(e); (3) in processing such petitions, the appropriate unit normally will be the single employer's employees covered by the agreement; and (4) upon the expiration of such agreements, the signatory union will enjoy no presumption of majority status, and either party may repudiate the 8(f) bargaining relationship.

*Id.* 282 NLRB at 1377–78. As part of the new structure, neither an employer nor a union who is a party to Section 8(f) agreements may unilaterally repudiate their relationship during the express period of the agreement. *Id.* 282 NLRB at 1387. The Board also determined that, at no time during the duration of the agreement does the union enjoy a presumption, rebuttable or otherwise, of majority status. *Id.*

▮ Because of the unique situation in which a Section 8(f) relationship arises, Board case law since *Deklewa* has set forth only two means by which a union may obtain Section 9(a) status during the course of a Section 8(f) relationship: (1) through a Board-certified election, or (2) through an employer's voluntary grant of recognition of the union as the employees' exclusive majority bargaining agent. Unless and until a relationship is proved to be otherwise, a bargaining relationship between a construction industry employer and a union is presumed to be 8(f) rather than 9(a). *See Comtel Sys. Technology,* 305 N.L.R.B. 287, 289 (1991). The burden of proving a 9(a) relationship rests on the party asserting its existence. *Casale Indus.,* 311 N.L.R.B. 951, 952, 1993 WL 189906 (1993). Because the Board determined below that the Union had met its burden of proving that Goodless granted it voluntary recognition, we focus our inquiry on the latter ground.

The NLRB has held that "a party may prove the existence of a 9(a) relationship . . . through . . . a union's express demand for, and an employer's voluntary grant of, recognition to the union as bargaining representative based on a contemporaneous showing of union support among a majority of the employees in an appropriate unit." *J & R Tile, Inc.,* 291 N.L.R.B. 1034, 1036, 1988 WL 214248 (1988). There must be "positive evidence" that the "union unequivocally demanded recognition as the employees' 9(a) representative and that the employer unequivocally accepted it as such." *Id.*

▮ The cases in which the Board has applied this approach fall into two categories, the first finding that the acts of the union and the employer transformed their Section 8(f) relationship into a Section 9(a) relationship, and the second determining that the parties failed to meet the requirements for such a transformation. A consistent theme running throughout the cases in the first category is the requirement that all of the following three parts of the voluntary recognition test be met: (1) the union must

expressly and unequivocally demand recognition as the employees' Section 9(a) representative; (2) the employer must expressly and unequivocally grant the requested recognition; and (3) that demand and recognition must be based on a *contemporaneous* showing that the union enjoys majority support of the employers' workforce.

■ Board case law emphasizes that the third requirement is essential. In addition to an actual showing of majority support through the presentation of employee-signed authorization cards to an employer, *see Hayman Electric*, 314 N.L.R.B. 879, 886, 1994 WL 463667 (1994), or through an employer-conducted poll prior to initial recognition, *see Precision Striping*, 284 N.L.R.B. 1110, 1112, 1987 WL 288127 (1987), the Board has found as sufficient to satisfy the third requirement a union's claim of majority support that went unchallenged by the employer for a period of more than six months. *See, e.g., Triple A Fire Protection, Inc.*, 312 N.L.R.B. 1088, 1089 (1993) (declining to question whether the union actually achieved the majority status it claimed at the time the employer recognized it when the challenge to such status came over four years after the agreement); *Casale Indus.*, 311 N.L.R.B. 951, 953 (1993) (refusing to permit employer's challenge to union's majority status arising six years after the union claimed to have obtained that status and limiting the window for challenge to six months from the time majority status is claimed); *Golden West Elec.*, 307 N.L.R.B. 1494, 1495, 1992 WL 183678 (1992) (holding that employer's act of reading and signing, and later acknowledging its agreement with, a letter stating that the union represented a majority of employees was sufficient showing of the union's majority status to find a Section 9(a) relationship). Similarly, the Board found the third requirement to be met where an employer's admission or acknowledgement that the union enjoyed majority support among its employees was given contempora-

neously with the demand for recognition and was provided without further inquiry into the union's actual status. *See Golden West Elec.*, 307 N.L.R.B. at 1495 (relying on the employer's admission of majority status to satisfy the burden of showing Section 9(a) status). From this case law it is clear that when a union claims it has attained majority status and the parties, based on that claim, agree to a Section 9(a) relationship, the employer must challenge that status within a reasonable period of time (six months), or be bound by its agreement.

■ The Board has also held that notwithstanding the parties' intention to enter into a Section 9(a) relationship, their relationship is not entitled to Section 9(a) status if the union has not actually achieved majority status prior to the time of the demand. *See Comtel Sys. Tech.*, 305 N.L.R.B. 287, 289, 1991 WL 206684(1991) (determining no Section 9(a) relationship would be established unless union made a showing of majority support of single-unit employer's employees prior to that employer's entry into a multiemployer bargaining relationship claimed to be governed by Section 9(a)); *see also J & R Tile*, 291 N.L.R.B. at 1037 (declining to find that predecessor employer and union had entered into Section 9(a) relationship where no showing was made that the union had obtained majority support at the time of the parties' agreement and no indication was presented that the parties intended a Section 9(a) relationship); *James Julian, Inc.*, 310 N.L.R.B. at 1253 (describing the finding regarding the predecessor employer in *J & R Tile* as based on the lack of evidence that "the collective-bargaining agreement was entered on the basis of a demonstrated showing of the union's majority"). Thus, Board precedent indicates that the union's demand for and the employer's grant of recognition must be predicated on at least an unchallenged claim, if not an actual showing, of *contemporaneous* majority support.[8]

8. In fact, the Board's General Counsel has noted its understanding of *Deklewa* and progeny as providing that failure to show majority support *at the time* of the demand will defeat any attempts at a Section 9(a) relationship. The General Counsel interpreted *Deklewa* and progeny as holding that, "to prove that a relationship in the

construction industry is a Section 9 relationship, there must be (1) a union demand to be recognized as the Section 9 representative; (2) an employer acceptance of the union's demand; and (3) majority status at the time of such demand and acceptance." Advice Ltr. from NLRB Gen. Counsel to Regional Director of Region 9,

■ Applying these principles to the undisputed facts in the instant appeal, we simply cannot find that the requirements set forth by the Board in *Deklewa* and subsequent cases have been satisfied. Quite simply, the requirement that a demand and recognition be *based* on a *contemporaneous* showing of majority support was never satisfied. The record does not support the conclusion that, when the Union presented the letter of assent to Goodless in June 1992, in which it allegedly sought Goodless' recognition, it made a contemporaneous claim of majority support on which Goodless' recognition *of the union's majority status* could be made.[9] A showing of majority support at least a year later can hardly be considered a showing made contemporaneously with, and as a prerequisite to, the Union's demand for recognition.

Moreover, the cases that presume majority support still require contemporaneity. The record raises serious doubts regarding whether Goodless in fact conceded that the Union had obtained majority support. The Board concluded that Goodless' unartful statement at the June 25 meeting was evidence of its recognition of the union's majority status. Even assuming that the Board's interpretation of the meaning of Goodless' statement is sound, its case law unmistakably holds that nevertheless the showing of majority status must be contemporaneous with the demand and recognition of that status. These preconditions to a 9(a) recognition are clearly lacking here.

In arriving at its conclusion, the Board relied upon principles of contract law. *See*

*Goodless Elec. Co.*, 321 N.L.R.B. at 66. In discussing Goodless' signing of the letter of assent, the Board suggests that "the letter of assent constituted, for the remainder of its term, both a continuing request by the Union for 9(a) recognition and a continuing, enforceable promise by the Respondent [Goodless] to grant voluntary recognition on that basis if the Union demonstrated majority support." *Id.* On this point, we have noted that "[t]he prevailing rule, in this and other circuits, provides that technical rules of contract interpretation are not necessarily binding on the Board in the collective bargaining context, even though it is free to apply general contract principles so as to foster the established federal labor policy favoring collective bargaining." *NLRB v. Boston Dist. Council of Carpenters*, 80 F.3d 662, 665 (1st Cir.1996). Furthermore, it is clear that general contract law principles cannot supplant the requirement of a federal labor policy such as that embodied in Section 9(a) requiring that employees be represented by an organization approved by a majority of employees.

■ In the unique circumstances surrounding a Section 8(f) relationship between a construction industry employer and a union, for ten years the Board has followed a specific and discrete two-option rule for the transformation of that relationship into a Section 9(a) relationship. Under the plain terms of that rule, a finding in favor of Goodless is required. We cannot accept the Board's departure from its own precedent in this case in the absence of some cogent ex-

Feb. 27, 1989, 1989 WL 241614, at *2 (Feb. 27, 1989). In determining that, under the facts presented to it, no Section 9(a) relationship could be found because "there has been no showing that the Union represents a majority of the employees in the appropriate unit," it noted:

> Even if the Union does, in fact, represent a majority of the Employer's employees, *J & R Tile* makes clear that there must be explicit proof presented contemporaneously with the Union's demand and the Employer's voluntary recognition. Thus, although the Employer's ambiguous statements arguably may indicate that it believed the Union had majority support, those statements are insufficient to confer 9(a) status upon the Union without actual demonstration of that majority status.

*Id.*

9. In its brief, the Board suggests that *Decorative Floors, Inc.*, 315 N.L.R.B. 188, 189 (1994), and *Hayman Electric, Inc.*, 314 N.L.R.B. 879, 887 n. 8 (1994), support the opposite conclusion regarding the requirement of a showing of majority support. While the Board is quite correct that neither of these opinions required that the union demonstrate through extrinsic evidence the existence of majority support, they were not so required because in *Hayman Electric*, the union had made a *claim* of majority support, which the employer failed to challenge, and in *Decorative Floors*, the employer had signed a recognition agreement explicitly stating that the union had attained majority status. The same is not true here.

planation, an explanation that has not been forthcoming.[10] *See Shaw's Supermarkets, Inc.*, 884 F.2d at 35 ("Although the Board is not permanently bound by its precedent, when it wishes to deviate from well-established precedent as significantly as it has done here, it must, at least, explain the reasons for its deviation.").[11] Under Board precedent, the parties maintained a Section 8(f) relationship because no contemporaneous showing of majority support accompanied the Union's demand to Goodless. Thus, Goodless did not violate Section 8(a)(5) by repudiating that relationship or by unilaterally changing the terms and conditions of employment under the circumstances of this appeal.

As a final matter, the Board's finding that the apprentices were constructively discharged rested upon its conclusion that Goodless committed unfair labor practices by repudiating its relationship with the Union, and by unilaterally implementing changes in the terms and conditions of employment. Because we do not agree with that finding, we cannot enforce a ruling predicated upon it. We therefore deny enforcement of the Board's finding that Goodless violated Sections 8(a)(3) and (1) by constructively discharging the apprentices.

## CONCLUSION

For the foregoing reasons, we *reverse* and *remand* to the National Labor Relations Board for proceedings in accordance with this opinion.

Costs to respondent.

---

**10.** Indeed, the Board does not acknowledge that its decision is a departure from past precedent.

**11.** As a secondary matter, we do not think that the Union's demand, let alone Goodless' recognition, could be considered "unequivocal" when it was subject to a contingency whose fulfillment had no temporal limitations. Indeed, the contin-

gency may never have been met. Without any reasonable, temporally limiting principles, we cannot affirm the Board's conclusion that a demand and recognition may be properly considered unequivocal when subject to a contingency whose fulfillment may never occur.