**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**JUL 10 2000**

**PATRICK FISHER**
**Clerk**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

NATIONAL LABOR RELATIONS
BOARD,

     Petitioner,

v.

TRIPLE C MAINTENANCE, INC.,

     Respondent,

     and

INTERNATIONAL ASSOCIATION
OF HEAT AND FROST
INSULATORS AND ASBESTOS
WORKERS LOCAL UNION 64
("LOCAL 64").

     Intervenor.

No. 99-9500

---

**ON PETITION TO ENFORCE ORDER OF THE**
**NATIONAL LABOR RELATIONS BOARD**
**(Case No. 17-CA-19243)**

---

Robert J. Englehart, Attorney (Frederick C. Havard, Supervisory Attorney;
Frederick L. Feinstein, General Counsel; Linda Sher, Associate General Counsel;
John D. Burgoyne, Acting Deputy Associate General Counsel, with him on the
brief), National Labor Relations Board, Washington, D.C., for Petitioner.

Stephen L. Andrew (D. Kevin Ikenberry with him on the briefs) of Stephen L.

Andrew & Associates, Tulsa, Oklahoma, for Respondent.

Robert D. Kurnick of Sherman, Dunn, Cohen, Leifer & Yellig, P.C., Washington, D.C. (Walter C. Brauer, III, of Brauer, Buescher, Valentine, Goldhammer & Kelman, Denver, Colorado, with him on the brief), for Intervenor.

_____

Before **HENRY**, **McKAY**, and **ANDERSON**, Circuit Judges.

_____

**McKAY**, Circuit Judge.

_____

The National Labor Relations Board petitions for enforcement of the Decision and Order it issued to Respondent Triple C Maintenance, Inc., on October 30, 1998, finding that Triple C is not free to attack a collective bargaining agreement on the basis of a claim of lack of majority support after more than six months had elapsed from the time the agreement was entered into and that Triple C violated § 8(a)(1) and (5) of the National Labor Relations Act [NLRA or Act].  International Association of Heat and Frost Insulators and Asbestos Workers Local Union 64 [Union] intervenes to support the Board's petition.  We exercise jurisdiction under 29 U.S.C. § 160(e).

**I.**

Triple C is an Oklahoma company engaged primarily in the installation of

insulation products in the greater Tulsa, Oklahoma, area. Triple C is owned by Chester Cline and his daughter-in-law, Lori Cline, who is married to Carlton Cline. On June 17, 1993, Triple C entered into a collective bargaining agreement with the Union, which was patterned after a contract between the Union and a multiemployer bargaining association, the Master Insulators Association of Tulsa. The contract was effective for one month, until July 15, 1993. It included a recognition clause stating that Triple C recognized the Union "as the sole and exclusive bargaining agent" for the unit employees, the unit was "appropriate for bargaining within the meaning of [§] 9(a)," and "this recognition [was] predicated on a clear showing of majority support for [the Union] indicated by [the] bargaining unit employees." R., Vol. II, Ex. GC3 at 2 (Art. II, § 2). When Triple C entered into the agreement with the Union in June 1993, its only employee was Carlton Cline. Although he signed an authorization card, Carlton was not a statutory employee for purposes of § 9(a) because he was the husband and son of the owners. See 29 U.S.C. § 152(3) (excluding from the definition of employee "any individual employed by his parent or spouse").

On July 16, 1993, Triple C entered into a contract with the Union for the period from July 16, 1993, to June 15, 1994, which contained the same recognition clause language as the previous month-long agreement. In September 1993, Triple C hired two employees, both of whom had signed authorization cards

designating the Union as their exclusive representative. Triple C entered into subsequent contracts in 1994 and again in 1995, both of which contained the same recognition language as the previous contracts.

In April 1996, Triple C advised the Union that upon the expiration of the 1995-1996 agreement it might choose not to renegotiate with the Union. After unsuccessfully attempting to negotiate a six-month rather than a year-long contract, Triple C did not sign the 1996-1997 contract. However, it is uncontested that Triple C operated for several months as though it were still applying the expired contract. It continued to make monthly contributions to the Union benefit funds until December 1996, and it made three requests to use the Union's wage equality fund during the same time period. On November 24, 1996, Triple C notified the Union that it had laid off its employees, and the Union subsequently advised Triple C that it would withhold wage equality payments until Triple C signed the 1996-1997 contract. In April 1997, Triple C notified the Union that no contract existed between them for the 1996-1997 period, that it would not sign a new contract for 1997-1998, and that it no longer recognized the Union. See R., Vol. II, Ex. GC18; Vol. III, Doc. 1 at 5.

The Union filed unfair labor practice charges against Triple C, alleging that it improperly refused to sign the 1996-1997 agreement and negotiate a new agreement, failed to adhere to the terms of the 1996-1997 collective bargaining

-4-

agreement, and improperly withdrew recognition from the Union. Triple C responded by arguing that because its relationship with the Union was governed by § 8(f) it was entitled to repudiate that relationship when the contract expired. The Union argued that the relationship between the parties was governed by § 9(a) and that Triple C is barred from raising the § 8(f) defense under § 10(b) of the NLRA.

An administrative law judge tried the case and determined that Triple C was "precluded from attacking the purported Section 9(a) contract by the limitations period set forth in Section 10(b) of the Act." Id., Vol. III, Doc. 1 at 6. The Board affirmed the decision of the administrative law judge with some modifications. While they agreed that the recognition clause of the initial collective bargaining agreement showed that the Union had majority status, Board Members Fox and Liebman found that Triple C was "not free to attack the agreement on the basis of a claim of lack of majority [status] after more than [six] months had elapsed." Triple C Maintenance, Inc., 327 N.L.R.B. No. 15, 1998 WL 799280, at *1 n.1 (1998). Board Member Hurtgen, on the other hand, stated that Triple C could not have entered into a 9(a) relationship in June 1993 because it had no employees at that time, but when Triple C signed the new agreement in 1994, which contained the same § 9(a) recognition language, it had employees and therefore recognized the Union as the exclusive representative of those

-5-

employees under § 9(a).  See id.  This appeal followed.

We review the Board's application of the law to particular facts under the substantial evidence standard.  Under § 10(e) of the NLRA, 29 U.S.C. § 160(e), the Board's factual findings are conclusive if they are supported by substantial evidence in the record as a whole.  See Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951); NLRB v. American Can Co., 658 F.2d 746, 753 (10th Cir. 1981).  To the extent that the Board's resolution of an issue involves the application of a rule that "'fill[s] the interstices of the broad statutory provisions,'" that rule must be accorded "considerable deference."  NLRB v. Curtin Matheson Scientific, Inc., 494 U.S. 775, 786 (1990) (citation omitted).

## II.

There are two issues controlling our decision:  (1) whether the relationship between the union and the employer was governed by § 8(f) or § 9(a), and (2) whether § 10(b) precludes the employer from attacking the formation of a 9(a) relationship.  One approach a court might take in addressing these issues would be to determine first whether an employer is precluded from attacking the purported § 9(a) agreement by the limitations period in § 10(b).  If the employer were so precluded, a court could refuse to examine whether the agreement satisfies the requirements of § 9(a) recognition.  However, because the party

-6-

asserting the existence of a 9(a) relationship has the burden to prove its existence, we believe the proper approach is first to examine whether the bargaining agreement, on its face, demonstrates that the parties intended to form a 9(a) relationship as opposed to one governed by § 8(f). Then, if it is clear from the agreement that a 9(a) relationship was intended, which means that the parties had sufficient notice that § 9(a) governs their agreement, we examine whether a challenge to the 9(a) status, and its presumption of majority support, is reasonably restricted by a period of limitations under § 10(b) or otherwise.

## A. The 9(a) – 8(f) Distinction

The dispute between § 8(f) or § 9(a) governance finds its origins in the NLRA which made a distinction between the multiemployer bargaining relationships it recognizes. Section 9(a) of the Act, 29 U.S.C. § 159(a), provides that when a majority of employees in a unit appropriate for collective bargaining designates a labor union to represent it, the union becomes the exclusive representative for collective bargaining purposes. Under § 9(a) an employer may not unilaterally repudiate a contract and has a duty to bargain in good faith after the contract expires. See James Luterbach Constr. Co., 315 N.L.R.B. 976, 979 (1994). This is because the union that has attained the status of a 9(a) bargaining representative enjoys a presumption of majority status for the duration of a

contract or for a reasonable period.  See Auciello Iron Works, Inc. v. NLRB, 517 U.S. 781, 786 (1996).  When a contract or reasonable period expires, the employer may rebut the presumption of majority status by showing either that the union does not in fact enjoy majority support or that the employer has a "good-faith reasonable" doubt of the union's continued majority status.  See Allentown Mack Sales & Serv. v. NLRB, 522 U.S. 359, 361 (1998).

On the other hand, § 8(f) of the Act, 29 U.S.C. § 158(f), allows employers engaged primarily in the building and construction industry to enter into pre-hire agreements containing union security clauses whether or not the union represents a majority of the employer's employees.  Under an 8(f) contract, the union enjoys no presumption of majority status and either party may repudiate the relationship upon the expiration of the contract.[1]  See Luterbach, 315 N.L.R.B. at 978; see also Sheet Metal Workers' Internat'l Ass'n Local 19 v. Herre Bros., Inc., 201 F.3d 231, 239 (3d Cir. 1999).

---

[1]Prior to the Board's decision in John Deklewa & Sons, Inc., 282 N.L.R.B. 1375 (1987), enforced sub nom. International Ass'n of Bridge, Structural & Ornamental Iron Workers v. NLRB, 843 F.2d 770 (3d Cir. 1988), an 8(f) agreement could be repudiated by either party at any time for any reason.  See id. at 1378.  Likewise, an 8(f) relationship could be converted into a 9(a) relationship at any time when the union could show that it had obtained majority support.  See id.  When an 8(f) relationship converted into a 9(a) relationship, "an employer [was obligated] . . . 'to recognize and bargain with the union as the employees' exclusive representative.'"  Id. at 1379 (quoting Davis Indus., 232 N.L.R.B. 946, 952 (1977)).

A relationship between a union and a construction industry employer is presumed to be governed by § 8(f), and "the party asserting the existence of a 9(a) relationship [has the burden] to prove it." John Deklewa & Sons, Inc., 282 N.L.R.B. 1375, 1385 n.41 (1987), enforced sub nom. International Ass'n of Bridge, Structural & Ornamental Iron Workers v. NLRB, 843 F.2d 770 (3d Cir. 1988); accord NLRB v. Viola Indus.-Elevator Div., Inc., 979 F.2d 1384, 1394-97 (10th Cir. 1992); see also Casale Indus., Inc., 311 N.L.R.B. 951, 952 (1993). A union can prove a 9(a) relationship and overcome the presumption of an 8(f) relationship in two ways: "(1) through a Board-certified election, or (2) through an employer's voluntary grant of recognition of the union as the employees' exclusive majority bargaining agent." NLRB v. Goodless Elec. Co., 124 F.3d 322, 328 (1st Cir. 1997); see also Deklewa, 282 N.L.R.B. at 1387 n.53. The Board has explained that a party attempting to satisfy the voluntary recognition option may overcome the 8(f) presumption by showing three things: (1) the union's unequivocal demand for recognition as a 9(a) representative; (2) the employer's unequivocal and voluntary grant of such recognition; and (3) a contemporaneous showing of majority support. See Goodless Elec. Co., 321 N.L.R.B. 64, 65-66 (1996); rev'd on other grounds, 124 F.3d at 328; Golden West Elec., 307 N.L.R.B. 1494, 1495 (1992); J & R Tile, Inc., 291 N.L.R.B. 1034, 1036 & n.11 (1988).

The threshold issue in this case is what kind of proof is necessary to satisfy the third prong of the voluntary recognition option. The Board and the Union assert that a contemporaneous showing of majority support may be established without extrinsic proof of majority status. Triple C argues that a 9(a) relationship was not established because the voluntary recognition was not based on actual objective proof of majority support. In fact, Triple C contends that a 9(a) relationship could not have been formed because, at the time it signed the contract with the Union in 1993, the company had only one employee who did not qualify as an employee for purposes of § 9(a), thus no majority support existed. We are not persuaded by Triple C's arguments.

Because an 8(f) agreement is available to the construction industry, a union's demand to execute a collective bargaining agreement with an employer is inherently ambiguous. See J & R Tile, 291 N.L.R.B. at 1036 & n.11. As a result, instead of focusing on the third requirement of a contemporaneous showing of majority support, the Board seems to have given much attention to the first two requirements of the three prong standard for voluntary recognition, i.e., whether the union sought and the employer extended recognition under § 9(a). See, e.g., id. at 1037 (holding that "the evidence [was] insufficient to establish that the Employer . . . entered into a 9(a) . . . relationship with the Union" because "there [was] no evidence indicating that the Union sought, and thereafter was granted,

-10-

recognition as the 9(a) representative of the Employer's employees"); see also Triple A Fire Protection, Inc., 312 N.L.R.B. 1088, 1088 (1993) (emphasizing importance of recognition form–signed by the employer–which "voluntarily and unequivocally granted recognition to the Union as [the] 9(a) representative" and which acknowledged proof of union's majority status), enforced, 136 F.3d 727 (11th Cir. 1998), cert. denied, 525 U.S. 1067 (1999). The Board has held, for example, that "to establish voluntary recognition pursuant to Section 9(a) . . . there must be evidence that the union unequivocally demanded recognition as the employees' 9(a) representative and that the employer unequivocally accepted it as such." J & R Tile, 291 N.L.R.B. at 1036. "[T]he Board will require positive evidence that the union sought and the employer extended recognition to a union as the 9(a) representative of its employees before concluding that the relationship between the parties is 9(a) and not 8(f)." Id. It is clear from these principles that, in order to satisfy the voluntary recognition standard, the Board requires rigorous compliance with its first two prongs.

The Board, however, has interpreted the contemporaneous showing requirement with greater latitude; it can be met in a number of ways. Board precedent indicates that majority support may be contemporaneously shown by actual objective proof, such as the presentation of employee authorization cards to an employer, see Hayman Elec., Inc., 314 N.L.R.B. 879, 886 (1994), or an

"employer-conducted poll prior to initial recognition," Precision Striping, Inc., 284 N.L.R.B. 1110, 1112 n.6 (1987). At the same time, a contemporaneous showing of majority support occurs where, external to the contract, an employer admits or acknowledges that the union enjoyed majority support at the time that it demanded such recognition. See Golden West Elec., 307 N.L.R.B. at 1495 (holding as sufficient proof of a 9(a) relationship the terms of the voluntary recognition agreement signed by the employer and the employer's testimony that it "knew at the time it signed the [recognition] agreement that . . . the Union was seeking recognition as the unit employees' majority representative and that the Employer was granting the Union recognition as such").

Not all Board decisions rely on some sort of extrinsic evidence to satisfy the contemporaneous showing requirement and prove the existence of a 9(a) relationship. To the contrary, several Board decisions make clear that the contemporaneous showing requirement may be satisfied by contractual language indicating that a union has offered to show its majority status and that the employer acknowledges and is satisfied by that offer. For example, in Decorative Floors, Inc., 315 N.L.R.B. 188, 188 (1994), the employer signed a recognition agreement which unequivocally demanded and granted § 9(a) recognition, outlined the union's offer to establish majority status by allowing the employer to examine authorizations cards, and explicitly stated that the employer was satisfied

that the union represented a majority of its employees. The Board held that "the contractual language, standing alone, [was] sufficient to establish that [a 9(a)] relationship existed." Id. at 189. The Board again held that a 9(a) relationship was established where the employer executed a document in which it acknowledged that it had verified the union's majority status "on the basis of objective and reliable information," but where no other independent evidence of majority status existed in the record. MFP Fire Protection, Inc., 318 N.L.R.B. 840, 841-42 (1995), enforced on other grounds, 101 F.3d 1341, 1343 (10th Cir. 1996); cf. American Automatic Sprinkler Sys., Inc. v. NLRB, 163 F.3d 209, 221-22 (4th Cir. 1998) (noting that Board incorrectly concluded that the union had attained 9(a) status because the language in contract did not evidence an unequivocal demand for or grant of voluntary recognition nor a contemporaneous showing of majority support), cert. denied, __ U.S. __ , 120 S. Ct. 65 (1999);[2]

_____

[2]A close reading of American Automatic Sprinkler reveals that its holding does not contradict ours. The Fourth Circuit held that the employer's voluntary recognition was not enough to establish a 9(a) relationship. The court requires explicit proof of actual majority status presented contemporaneously with the union's demand and the employer's voluntary recognition. See American Automatic Sprinkler, 163 F.3d at 221-22. There are two important differences between that case and this one.

First, unlike the collective bargaining agreement in this case, the agreement in American Automatic Sprinkler did not recite that § 9(a) recognition was based on any showing of majority support. See id. at 221-22. Our decision today determines that an agreement containing some offer of proof or acknowledgment of a showing of majority status satisfies the contemporaneous showing

-13-

Goodless Elec., 124 F.3d at 329 (stating that Board precedent provides that "the union's demand for and the employer's grant of [§ 9(a)] recognition must be predicated on at least *an unchallenged claim*, if not an actual showing, of contemporaneous majority support"); James Julian, Inc., 310 N.L.R.B. 1247, 1253-54 (1993) (holding that a 9(a) relationship was not established because, unlike prior Board decisions including Golden West Elec., the recognition agreements did not contain any acknowledgment of the union's majority status and there was no evidence that the parties unequivocally intended the agreements to create a 9(a) relationship). Accordingly, in the cases in which the Board determined that a 9(a) relationship existed without independent proof of majority

_____

requirement. In other words, if the agreement represents that § 9(a) recognition is based on a showing of majority support, that acknowledgment satisfies the contemporaneous showing requirement sufficient to overcome the 8(f) presumption, so long as the other § 9(a) requirements are met. Nothing in the Fourth Circuit decision undermines that determination. Moreover, by requiring at least a recitation of an offer of proof of majority support or an acknowledgment of a showing of majority status, our decision today does not reduce the contemporaneous showing requirement to a "hollow form," a concern expressed by the Fourth Circuit. Id. at 222.

Second, American Automatic Sprinkler is also distinguishable based on the type of evidence presented to establish majority support. The union in that case attempted to use as proof of majority status the union membership count determined by the union security clause. Because Deklewa specifically rejected this type of evidence as proof of majority support, the Fourth Circuit correctly held that it could not count as a contemporaneous showing of majority support. See id. at 220. There is no contention in this case that majority support was unlawfully established by a union security clause.

-14-

support, the critical component is that the agreements either describe a contemporaneous showing of majority status or have the employer acknowledge the fact that majority status was shown.

In accordance with Board precedent, the Third Circuit recently held that the recitations of a "collective bargaining agreement constitute[d] uncontroverted proof that the parties were governed by § 9(a)." Sheet Metal Workers' Internat'l Ass'n Local 19 v. Herre Bros., Inc., 201 F.3d 231, 242 (3d Cir. 1999). The court determined that the "language conclusively establishes a 9(a) relationship" because it "unequivocally states that the employer recognizes the Union as the exclusive majority representative[,] . . . [and it] recites that the Union submitted proof and that the employer is satisfied that the union represents a majority of its employees based on that proof." Id. We adopt the reasoning of the Third Circuit on precisely this point. We hold that the language of a bargaining agreement itself may satisfy the requirement of a contemporaneous showing of majority support and overcome the 8(f) presumption where it unequivocally demonstrates that the parties intended to be governed by § 9(a). The agreement must, at the very least, show that the union demands § 9(a) recognition, recite that the employer recognizes the union as the exclusive representative of an appropriate unit of employees based on some showing of majority support, and demonstrate that the employer acknowledges and accepts the showing of majority support for

-15-

the union.

The collective bargaining agreements entered into by Triple C and the Union in 1993, 1994, and 1995 meet this standard. The initial bargaining agreement, as well as the subsequent agreements, unequivocally states that Triple C "recognize[s] [the Union] as the sole and exclusive bargaining agent for . . . a unit [of employees] appropriate for bargaining within the meaning of Section 9(a)." R., Vol. II, Ex. GC3 at 2. Significantly, the agreement also represents that "[t]he Employer agrees that this recognition is predicated on a clear showing of majority support for [the Union] indicated by bargaining unit employees." Id. While the agreement does not state that the Union unequivocally demanded recognition, such a demand is clearly implied by the content of the entire recognition clause and by the fact that the Union presented Triple C with the collective bargaining agreement. See Sheet Metal Workers', 201 F.3d at 242; cf. Stanford Realty Assoc., Inc., 306 N.L.R.B. 1061, 1061 n.2 (1992) (determining, in non-construction industry context, that the union's "requests [of employer] to sign a contract subsumed a demand for recognition"). In addition, although the above contract language "conclusively gives notice that a 9(a) relationship is intended" even without reciting § 9(a), Sheet Metal Workers', 201 F.3d at 242, the reference to the statutory section is particularly helpful in this case

-16-

specifically and in these types of agreements generally.[3]  In other words, because

the agreement actually mentions § 9(a), Triple C's argument that it did not have

notice that § 9(a) governed its relationship with the Union rings rather hollow.

Further, we see no analytical difference between the case where a contract states

that the union offered authorization cards to the employer as proof of majority

support but the employer waived the opportunity to see the cards and the case

where the contract signed by the employer and the union recites both that there

was a clear showing of majority support for the union and that the employer

accepted that proof and acknowledged majority status.  Cf. Decorative Floors, 315

N.L.R.B. at 188-89.

The Board's conclusion that the contract language satisfies all the

requirements necessary to rebut the 8(f) presumption, including the requirement

of a contemporaneous showing of majority support, is supported by substantial

evidence.  We hold that the language recited in the collective bargaining

agreements in this case "constitutes uncontroverted proof that the parties were

---

[3]Despite our view that the use of § 9(a) in recognition agreements is advisable and assists in carrying the burden of overcoming the 8(f) presumption, we do not disagree with the Third Circuit's determination that reference to § 9(a) is not necessary so long as the remainder of the recognition language conclusively shows that the parties intended § 9(a) to apply.  See Sheet Metal Workers', 201 F.3d at 242.

governed by § 9(a)."[4]  Sheet Metal Workers', 201 F.3d at 842.  That said, the question remains how § 10(b) affects the claims made by Triple C in this case.

## B.  The Time Limitation

Triple C contends that the Board improperly applied the six-month period of limitations set forth in § 10(b) of the NLRA to preclude Triple C's attack on the majority status of the Union at the time the parties entered into the collective bargaining agreement.  The Board and Union argue that the Board's application of a rule "limiting the circumstances in which a construction industry employer that grants Section 9(a) recognition to a union can subsequently challenge the union's majority status" is rational and should be upheld.  Intervenor's Br. at 24; see Petitioner's Br. at 25-26.

---

[4]Triple C argues that the Board is applying the pre-Deklewa conversion doctrine if a 9(a) relationship can be established without extrinsic evidence contemporaneously showing majority support.  We disagree.  Under the pre-Deklewa conversion doctrine, an 8(f) relationship automatically would convert into a 9(a) relationship when the union obtained a majority of employees.  According to the record in this case, conversion would have occurred in September 1993.  However, under Member Hurtgen's analysis, even if Triple C could challenge the Union's majority status when the contract was first signed in 1993, we think that a valid § 9(a) relationship was formed in July 1994 when Triple C executed a new contract which contained the 9(a) recognition language stating that Triple C had recognized the Union as the exclusive § 9(a) representative based on a clear showing of majority support.  See R., Vol. II, Resp. 2 at 2.  Because a majority of Triple C's employees had signed authorization cards when Triple C signed the new contract in 1994, Triple C cannot argue that there was no majority support.

-18-

Strictly speaking, § 10(b) requires that challenges to unfair labor practices must be made within six months after the commission of the alleged unfair labor practice.[5]  See 29 U.S.C. § 160(b); Local Lodge No. 1424 (Bryan Mfg.) v. NLRB, 362 U.S. 411, 419 (1960).  Accordingly, the provision precludes an employer who fails to object to the union's majority status within six months after a collective bargaining agreement is executed from attacking the lawfulness of the agreement on that basis thereafter.  While the literal language of § 10(b) refers only to the issuance of complaints, the Board and courts have used the reasoning of Bryan Manufacturing to extend the time limitation to prevent a defense to an unfair labor charge based exclusively on conduct which occurred in the pre-10(b) period and which would be barred under § 10(b) if it were alleged as a complaint.  See, e.g., Viola Indus., 979 F.2d at 1387; NLRB v. Tragniew, Inc., 470 F.2d 669, 673 (9th Cir. 1972); NLRB v. District 30, United Mine Workers of Am., 422 F.2d 115, 122 (6th Cir. 1969); Sewell-Allen Big Star, Inc, 294 N.L.R.B. 312, 313 (1989), enforced, 943 F.2d 52 (6th Cir. 1991).

The overriding purpose of the six-month statute of limitations is "to stabilize existing [collective] bargaining relationships" by preventing lawsuits

_____

[5]Section 10(b) reads in pertinent part:  "[N]o complaint shall issue based upon any unfair labor practice occurring more than six months prior to the filing of the charge with the Board and the service of a copy thereof upon the person against whom such charge is made . . . ."  29 U.S.C. § 160(b).

long after an unfair labor practice has occurred.  Bryan Mfg., 362 U.S. at 419; see also Auciello, 517 U.S. at 785 ("The object of the . . . Act is industrial peace and stability, fostered by collective-bargaining agreements providing for the orderly resolution of labor disputes between workers and employees."). Specifically, § 10(b) was enacted "to bar litigation over past events 'after records have been destroyed, witnesses have gone elsewhere, and recollections of the events in question have become dim and confused.'"  Bryan Mfg., 362 U.S. at 419 (citation omitted).

In Bryan Manufacturing, the union committed an unfair labor practice by entering into a collective bargaining agreement that contained a union security clause at a time when the union did not represent a majority of the employees. See id. at 412-13.  The agreement's union security clause required employees to join the union within forty-five days.  More than six months after execution of the collective bargaining agreement, employees filed unfair labor practice charges challenging the continued enforcement of the union security clause.  See id. at 414.  The Supreme Court held that the charges were time-barred by § 10(b).  See id. at 415.  It rejected the notion that the ongoing enforcement of the agreement was a continuing violation, because "the entire foundation of the unfair labor practice charged was the Union's time-barred lack of majority status when the original collective bargaining agreement was signed."  Id. at 417.  The Court

reasoned that enforcement of the union security clause itself was permissible and that the charges were based on a time-barred occurrence, i.e., the execution of the collective bargaining agreement with a security clause at a time when the union did not have majority status.  See id. at 417-19.  The Court refused to vitiate the policies behind the limitations period by converting enforcement of a collective bargaining agreement, perfectly lawful on its face, to an unfair labor practice by reference to an event that, because of a time limitation, could not be the subject of an unfair labor practice complaint.  See id. at 419.

Although § 10(b) was promulgated in the context of the non-construction industry where minority recognition is unlawful, the Board and several courts of appeals have extended it or a similar limitations period to the construction industry.  For example, in Casale Industries, 311 N.L.R.B. at 952-53, the Board determined that, while the parties clearly intended a 9(a) relationship, it was unclear whether a 9(a) relationship was successfully created because a privately conducted election did not adequately show that the union had majority support.  However, the Board refused to allow the employer to challenge the union's majority status at the time of recognition because more than six months had passed since that recognition.  The Board stated that "if a construction industry employer extends [§] 9(a) recognition to a union, and [six] months elapse without a charge or petition, the Board should not entertain a claim that majority status

was lacking at the time of recognition." Id. at 953. The Board reasoned that, because unions should not have less favored status with construction industry employers than with non-construction employers, the 10(b) six-month time limitation should apply to construction cases. See id. In short, the Board's rationale was to avoid disparity between the construction and non-construction industries.

In addition to its decision in Casale Industries, the Board has applied the six-month limitations period in two other cases involving construction industry employers. In Triple A Fire Protection, 312 N.L.R.B. at 1089, the Board held that the six-month limitations period precluded the employer's attempt to challenge the union's showing of majority status approximately four years after the employer signed a contract recognizing a 9(a) relationship. Because the parties intended to establish a bargaining relationship under § 9(a) but waited four years to object, the Board concluded that it would "not at this late date inquire into the Union's showing of majority status." Id. The Eleventh Circuit enforced the Board's decision, stating that the Board's application of the 10(b) limitations period was reasonable and not erroneous. See NLRB v. Triple A Fire Protection, Inc., 136 F.3d 727, 736-37 (11th Cir. 1998), cert. denied, 525 U.S. 1067 (1999). The court reasoned that the employer had granted § 9(a) recognition to the union and that "[i]t has long been recognized that section 10(b) prohibits employers

from waiting more than six months to attack the majority status of union representation at the time of recognition." Id. at 736; see also Viola Indus., 979 F.2d at 1387. It also relied on the notion established in Deklewa that unions in the construction industry should not have less favored status than unions outside the construction industry. See Triple A Fire Protection, 136 F.3d at 737.

The Board again applied a time-bar in MFP Fire Protection, 318 N.L.R.B. at 842. There the Board refused to inquire into the union's showing of majority status after four years had passed since the most recent agreement was executed by the employer which voluntarily recognized the union as a 9(a) representative. See id. This court enforced that decision, holding that the Board did not err in applying § 10(b)'s six-month limitations period to bar "the employer from retrospectively asserting the absence of a § 9(a) relationship" after such a long period of time had passed since recognition. MFP Fire Protection, Inc. v. NLRB, 101 F.3d 1341, 1344 (10th Cir. 1996); see also Goodless Elec., 124 F.3d at 329 (reading Board precedent to require that "when a union claims it has attained majority status and the parties, based on that claim, agree to a Section 9(a) relationship, the employer must challenge that status within a reasonable period of time (six months), or be bound by its agreement"). But see American Automatic Sprinkler, 163 F.3d at 218 n.6 (allowing the party against whom the complaint has been filed to defend itself by challenging the validity of evidence of effective

voluntary recognition despite § 10(b)).[6]

In light of these decisions by the Board and this court, as well as those by the First and Eleventh Circuit courts, we see no reason why the Board's application of a time bar to challenges to the formation of a bargaining relationship based on a lack of majority status is unreasonable. In each instance where the Board properly precluded a challenge to the union's majority status in the construction industry context, a substantially longer span of time than six months had passed since the grant of § 9(a) recognition. See, e.g., MFP Fire Protection, 318 N.L.R.B. at 842 (four years); Triple A Fire Protection, 312 N.L.R.B. at 1088 (four years); Casale Indus., 311 N.L.R.B. at 953 (six years). Likewise in this case, even if § 10(b) itself does not explicitly apply because there is no statutory prohibition on minority recognition in the construction industry, the policy behind § 10(b) certainly applies. It is reasonable to bar a challenge to the Union's majority status and the formation of the contract after more than three years had passed.

Other facts also support the reasonableness of the Board's application of a

_____

[6]Although the Fourth Circuit notes in American Automatic Sprinkler, 163 F.3d at 218 n.6, that its analysis of whether § 10(b) applies to construction industry cases is contrary to this court's decision in MFP Fire Protection, 101 F.3d at 1343-44, and the Eleventh Circuit's decision in Triple A Fire Protection, 136 F.3d at 736-77, we believe the Fourth Circuit's decision is distinguishable on other grounds. See infra note 2.

limitations period. Not only did Triple C enter into a collective bargaining agreement which contained language unequivocally granting § 9(a) recognition to the Union as the exclusive bargaining representative of a majority of the appropriate employees but it also executed a series of three additional contracts, all of which contained language identical to the first contract. Similar to the situation in Bryan Manufacturing, the entire foundation of Triple C's defense against the unfair labor practice charges in this case is the Union's lack of majority status when the original collective bargaining agreement was signed. Cf. Bryan Mfg., 362 U.S. at 417. In fact, we think it is unreasonable to allow a party defending against unfair labor practice charges to challenge the validity of a collective bargaining agreement, which is perfectly lawful on its face, based on a three-year old event, i.e., majority status recognition. Moreover, we agree with the Union that "the application of a rule limiting the circumstances in which an employer can challenge a union's majority status [at the time of recognition] cannot depend on whether the union did or did not actually have majority status." Intervenor's Br. at 10.

Finally, the manner in which the burdens are allocated to the collective bargaining parties demonstrates the reasonableness of applying a period of limitations in the construction industry. Initially, under Deklewa, we presume that a contract formed between a union and an employer primarily engaged in the

construction industry is governed by § 8(f). Once the party asserting a 9(a) relationship demonstrates that the employer has recognized the 9(a) status of the union, then the presumption in favor of § 8(f) dies and a 9(a) relationship exists. However, a second presumption comes into play when a 9(a) relationship is established: Where a union has demonstrated, at least facially, that a 9(a) relationship exists, it enjoys a presumption of majority status for the duration of the contract or for a reasonable period. In order to reconcile these two presumptions, we hold that if a party challenges the union's majority status within a reasonable period of time from the date of recognition, then the burden remains on the union to prove its majority support in accordance with the initial § 8(f) presumption.[7] After a reasonable period of time has passed since the 9(a) recognition, and in keeping with the 9(a) presumption of majority status, it is then reasonable to preclude an attack on the 9(a) relationship based on a lack of majority support. This allocation of burdens also preserves the NLRA's goals of uniformity and stability.

---

[7]We note that a time limitation such as the one in § 10(b) is unique to both the employer and the employee. Thus, it does not begin to run until the parties have notice of the alleged illegal § 9(a) recognition (or other alleged illegal action). For example, with respect to employees, § 10(b)'s six-month limitations period would not begin to run until at least one statutory employee was hired or otherwise had notice of the employer's illegal actions. See Texas World Serv. Co. v. NLRB, 928 F.2d 1426, 1437 (5th Cir. 1991); R.J.E. Leasing Corp., 262 N.L.R.B. 373, 381-82 (1982). This accrual rule preserves the Act's goal of employee free choice.

We hold that it was not unreasonable for the Board to bar Triple C's challenge to the Union's majority status because a reasonable period of time had passed since Triple C had extended § 9(a) recognition, the parties were on notice that a 9(a) relationship was intended–as evidenced by the language of the contract, and the contract is facially valid.  The salutory effect of our holding furthers the overwhelming intent of the NLRA to achieve uniformity and stabilize bargaining relationships.

## III.

In sum, we hold that a collective bargaining agreement may, in and of itself, satisfy the requirement of a contemporaneous showing of majority support that is necessary to establish the existence of a 9(a) relationship and overcome the presumption accorded to § 8(f) relationships in the construction industry.  In addition, similar to the period of limitations in § 10(b) of the Act, the Board may apply a time bar to challenges to a union's § 9(a) majority status if a reasonable period of time has passed since the employer extended recognition to the union in a facially valid § 9(a) agreement.  The order of the Board is hereby **ENFORCED**.