STAHL, Senior Circuit Judge,
concurring in the judgment.
Petitioner Haas Electric, Inc. (“Haas”), seeks review of a decision and order of the National Labor Relations Board (“NLRB” or “Board”). The Board found that Haas violated its obligations under the National Labor Relations Act (“Act”), 29 U.S.C. §§ 151-69, by withdrawing recognition *25 from the International Brotherhood of Electrical Workers, Local No. 7 (“Union”), abrogating the collective-bargaining agreements to which it was bound, and making unlawful changes to the terms and conditions of employment. The Board has cross-petitioned for enforcement of the order.
The dispute in this case has centered on the questions of whether Haas provided adequate notice of its intent to withdraw the authority of the western Massachusetts chapter of the National Electrical Contractors’ Association (“NECA”) to negotiate with the Union on its behalf and whether Haas subsequently acted consistently with its notice of withdrawal.
I. Factual Background
Haas is a small electrical contractor in western Massachusetts. On February 1, 1991, Haas signed a letter of assent, which bound it to a collective bargaining agreement, negotiated between NECA and the Union, effective from July 1, 1990, through June 30, 1993 (“90-93 Contract”). The letter of assent additionally authorized NECA to act as Haas’s collective bargaining representative with respect to current and successive labor agreements and provided that the authorization would “remain in effect until terminated by the undersigned employer giving written notice to [NECA] and to the Local Union at least one hundred and fifty (150) days prior to the then current anniversary date of the applicable labor agreement.”
Just prior to 1989, Haas had been awarded a job on the Phoenix Mutual Life Insurance Building in Enfield, Connecticut. Largely due to infighting among the local Union chapters, resulting in significant cost overruns and delays in completion of the work, Haas lost $400,000 on that job and exhausted its line of credit with its bank. These losses, combined with a general recession that hit the region’s construction industry during the same period, forced Haas to approach the Union and request relief on the wage rates contained in the 90-93 Contract. The Union refused to offer any relief. Owner and president of Haas, Frederick Haas (“Mr. Haas”), a life-long member of the Union, was forced to exhaust his personal resources as a result. Because of this, Mr. Haas made the decision to revoke his own membership in the Union and to terminate Haas’s relationship with the Union and with NECA.
On January 2, 1992, Haas sent a letter to the Union, terminating the labor agreement with the Union, effective in 150 days. The letter read in part as follows:
Please be notified that as of the date posted on this letter, Haas Electric Inc .... is terminating the Labor Agreement between Haas Electric Inc., and [the Union]. Haas Electric Inc., also acknowledges that this intent becomes final 150 days from date of notification, according to mutual agreement. It is with deep regret that Haas Electric Inc., must make this decision after 36 years of membership as an organized labor contractor....
Please respond to this communication and forward your expectations of this contractor and put a final legal date of termination in your reply.
Haas sent the letter by certified mail and copied it to NECA and to the Union’s international representative. Notwithstanding the fact that the mail had been sent certified, none of the parties receiving the letter responded.
At about the same time, the Union, under pressure from NECA, agreed to reopen the 90-93 Contract. A series of reo-pener negotiations took place from March to June of 1992. Ralph Whitelock, Haas’s vice president, attended these sessions. *26 Although Whitelock did not state at any time that Haas was participating in the negotiations on a limited basis or as a nonmember of NECA, he subsequently testified that he made no proposals during the negotiations and that he did not vote on any contract change to take place after June 30, 1993, the date on which the contract by which Haas was bound would expire. As a result of the negotiations, the Union agreed to certain wage concessions. In return, NECA agreed to extend the contract through June 30, 1994 (“92-94 Contract”).
On June 11,1992, the Union sent Haas a letter of assent purporting to bind Haas to the 92-94 Contract. Haas declined to sign it, even though, by doing so, Haas forewent funds owed to it under the Union’s market recovery program, a program designed to assist union contractors in competing against non-union contractors on certain targeted jobs. Instead, on June 29, 1992, Haas wrote to NECA as follows:
It is the position of Haas Electric, Inc. that NECA has already been notified that Haas Electric, Inc., has withdrawn its authorization to have NECA act as its bargaining agent with the Local. Haas Electric hereby reaffirms its letter of January 2, 1992, notifying yourself and [the Union] of its intentions. Therefore, Haas Electric does not agree to be bound by any revisions to the existing agreement dated July 1, 1990 between [NECA] and [the Union],
This letter was copied to the Union.[1]
Despite the fact that Haas declined to sign the notice of assent, Haas took advantage of the concessions negotiated in the 92-94 Contract.
In the following fall and winter, Haas wrote to NECA twice more regarding Haas’s withdrawal from multiemployer bargaining. On November 4, 1992, Haas wrote that “effective November 1, 1992 [Haas] has resigned its membership in [NECA].”[2] On December 21, 1992, Haas wrote to request written confirmation that NECA had received Haas’s letters indicating its resignation.
At about the same time, the Union agreed to another set of negotiations over the possibility of granting further concessions. This second set of reopener negotiations took place in six meetings between December 17, 1992, and June 3,1993. The last meeting Haas attended was the fifth, on May 19, 1993. The parties finally reached an agreement on June 3, 1993, but the agreement was ratified only at the end of June 1993, after one additional change to the proposal. Under the agreement, the Union agreed to certain concessions, including the elimination of wage increases; in return, the contract was extended to June 30,1996 (“93-96 Contract”).
On June 30,1993, the date of the expiration of the original contract, Haas withdrew from the Union and ceased to abide by the terms of the collective bargaining agreement.
II. Procedural Background
On July 26, 1993, the Union filed an unfair labor practice charge alleging that Haas violated §§ 8(a)(1) and 8(a)(5) of the National Labor Relations Act, 29 U.S.C. §§ 158(a)(1) & (5), by refusing to abide by *27 a collective bargaining agreement and by unilaterally changing the terms and conditions of employment. The Union subsequently amended its charge to add that Haas had committed an unfair labor practice by withdrawing recognition from the Union. On September 30, 1993, the Regional Director issued a complaint and notice of hearing. After numerous delays over four years, during which the Regional Director first dismissed and then reinstated the claim of improper withdrawal of recognition from the Union, a hearing was held on October 14 and 15, 1997, in front of an administrative law judge (ALJ).
The ALJ found that Haas’s letters to the Union and NECA were sufficient to establish notice of its intent to withdraw NECA’s authority to bargain on its behalf. The ALJ further concluded that Haas’s conduct subsequent to the notice of withdrawal had not been inconsistent with this announced intent. The ALJ therefore held that Haas did not violate the National Labor Relations Act when it ceased recognizing the Union and altered the terms and conditions of employment after June 30, 1993.
The ALJ’s decision was not appealed by the NLRB’s general counsel. However, the Union filed exceptions to the decision before the Board. In an order issued on August 2, 2001, a majority of the Board concluded that Haas had unlawfully withdrawn recognition of the Union and had unlawfully changed the terms and eondi-tions of employment. Haas Elec., Inc., 334 N.L.R.B. No. 107 (2001) (“Board Decision”). The chairman of the Board dissented. Haas timely filed the petition before us.
III. Analysis
Under section 8(f) of the Act and current Board law, contracts such as those agreed to by NECA and the Union— known as prehire agreements[3] — are fully enforceable during their term. See John Deklewa & Sons, 282 N.L.R.B. 1375 (1987), enforced sub nom. Int’l Ass’n of Iron Workers, Local 3 v. NLRB, 843 F.2d 770 (3d Cir.1988). However, upon expiration of a prehire agreement, the employer may withdraw recognition from the union and avoid any obligation to bargain for a successor contract. James Luterbach Constr. Co., 315 N.L.R.B. 976, 978, 1994 WL 715997 (1994).
Under the standards set forth in Retail Associates, Inc., 120 N.L.R.B. 388, 1958 WL 13328 (1958), a stated intent to withdraw from multiemployer bargaining is effective only if it is both timely and unequivocal. Id. at 393-95. The timeliness requirement is met if the employer gives notice prior to the date on which negotiations are set to commence or actually commence. NLRB v. Charles D. Bonanno Linen Serv., Inc., 630 F.2d 25, 28 (1st Cir.1980), aff'd, 454 U.S. 404, 102 S.Ct. 720, 70 L.Ed.2d 656 (1982).[4] The requirement *28 that the stated intent be unequivocal is met if the notice is “unambiguous.” Custom Colors Contractors, 226 N.L.R.B. 851, 853 (1976), enforced sub nom. NLRB v. Beckham, Inc., 564 F.2d 190 (5th Cir.1977).
In addition to requiring that the employer provide timely and unequivocal notice of withdrawal from multiemployer bargaining, the Board has held that such withdrawal is nevertheless nullified if the employer’s conduct subsequent to the notice is inconsistent with the stated intent to withdraw. Dependable Tile Co., 268 N.L.R.B. 1147, 1147, 1984 WL 36081 (1984), enforced sub nom. NLRB v. Hartman, 774 F.2d 1376 (9th Cir.1985).
With respect to both the 92-94 Contract and the 93-96 Contract, the Board found that Haas’s letters were ineffective as notices of its intent to withdraw NECA’s authority to bargain on its behalf. The Board further found that, even if the letters had provided effective notice, Haas’s withdrawal was nullified by its inconsistent behavior subsequent to the delivery of the letters, namely Whitelock’s attendance at and participation in the negotiations leading up to the 92-94 and 93-96 Contracts. Haas now counters that it gave timely and unequivocal notice and behaved consistently thereafter with its stated intent to withdraw recognition from the Union and NECA. After briefly laying out the standard of review, I examine first whether Haas’s notice was effective and second whether its participation in the two sets of reopener negotiations negated an effective notice.
A. Standard of Review
Our standard of review of the NLRB’s determinations is deferential, provided its legal conclusions are “rational and consistent with the [National Labor Relations Act].” NLRB v. United Food and Commercial Workers, Local 28, 484 U.S. 112, 123, 108 S.Ct. 413, 98 L.Ed.2d 429 (1987). “We may not substitute our judgment for the Board’s when the choice is ‘between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it de novo.’ ” Yesterday’s Children, Inc. v. NLRB, 115 F.3d 36, 44 (1st Cir.1997) (citing Universal Camera Corp. v. NLRB, 340 U.S. 474, 488, 71 S.Ct. 456, 95 L.Ed. 456 (1951)). However, we only enforce the Board’s order if it correctly applied the law and if the factual findings are supported by substantial evidence.[5] Id. As the Supreme Court has clarified, although “[t]he ‘substantial evidence’ standard is not modified in any way when the Board and its examiner disagree!,] • • • evidence supporting a conclusion may be less substantial when an impartial, experienced examiner who has observed the witnesses and lived with the case has drawn conclusions different from the Board’s than when he has reached the same conclusion.” Universal Camera Corp., 340 U.S. at 496, 71 S.Ct. 456; see NLRB v. Walton Mfg. Co., 369 U.S. 404, 408, 82 S.Ct. 853, 7 L.Ed.2d 829 (1962) (“[T]he Examiner ... sees the witnesses and hears them testify, while the Board and the reviewing court look only at cold records.”). This court has stated that “where the board has reached a conclusion *29 opposite of that of the ALJ, our review is slightly less deferential than it would be otherwise.” C.E.K. Indus. Mech. Contractors, Inc. v. NLRB, 921 F.2d 350, 355 (1st Cir.1990).
B. Notice
The Board held that Haas’s January 2,1992 letter failed to provide notice of Haas’s intent to revoke NECA’s authority to negotiate on its behalf because the letter only purported to terminate the 90-93 Contract and to withdraw recognition from the Union. The Board reasoned that, because the letter of assent had given NECA authority to bargain on behalf of Haas for any current and subsequent labor agreement, Haas’s failure to reference specifically its withdrawal from NECA was fatal to any purported notice. I disagree. The January 2, 1992 letter specifically referenced the 150 days notification period noted in the letter of assent, which represents the amount of notification required to withdraw effectively NECA’s authority to bargain on an employer’s behalf. The letter was sent to the Union, but was also copied to NECA. As the ALJ pointed out, neither the Union nor NECA questioned the meaning of the letter; in fact, they failed to respond. Although Haas admittedly did not use precise language in articulating its intent to withdraw NECA’s authority, in my view, we cannot say that substantial evidence supports the conclusion that Haas’s intent was not unequivocal.[6] This is true especially when one places the January 2, 1992 letter in a larger context: Mr. Haas personally resigned from the Union shortly before preparing the letter; Haas later refused to sign , the letter of assent for the 92-94 Contract, although it lost much-needed funds as a result; and Haas followed up with letters on June 29, 1992, and November 4, 1992,[7] both of which asserted Haas’s intent to revoke NECA’s bargaining authority more clearly, even if still imperfectly. It appears that all of the panelists agree that Haas provided timely and unequivocal notice of its intent to revoke NECA’s authority to represent it in labor negotiations for any contract subsequent to June 30,1993.
C. Subsequent Conduct
Having established that Haas provided timely and unequivocal notice, I next address the Board’s conclusion that Haas’s conduct subsequent to this notice was inconsistent with its intent to withdraw from multiemployer bargaining. Haas argues that its subsequent conduct was not inconsistent with a stated intent to withdraw but was, instead, consistent only with its desire to monitor any interim changes that would apply to the 1990-1993 contract. After careful consideration, I agree with
*30 Haas. In doing so, I am mindful of precedent that precludes an employer from securing the “best of two worlds” by actively participating in negotiations for a subsequent agreement after it has withdrawn from group bargaining. See Sheet Metal Workers’ Int'l Ass’n Local 19 v. Herre Bros., Inc., 201 F.3d 231, 245-47 (3d Cir.1999); Dependable Tile, 268 N.L.R.B. at 1147; Associated Shower Door Co., 205 N.L.R.B. 677, 1973 WL 5179 (1973), enforced, 512 F.2d 230 (9th Cir.1975). However, this precedent stands for the proposition that the employer acts inconsistently with its intent to withdraw where it participates in negotiations for a new contract and not where it participates in negotiations to amend the terms of an existing contract by which it is already bound. In Dependable Tile, for example, the employer gave unequivocal notice on December 31, 1980, that it was withdrawing from multiemployer bargaining effective March 31, 1981, but the employer then proceeded to attend formal negotiation sessions seeking agreement on a contract to take effect after March 31, 1981. In clarifying its position that the employer had behaved inconsistently with its intent to withdraw, the Board stated that “[i]f [the employer] had merely participated in the sessions in order to administer the expiring contract — to which Respondent Dependable was admittedly bound — we would agree” that its conduct was consistent with its intent to withdraw. Dependable Tile, 268 N.L.R.B. at 1147. See also Sheet Metal Workers’ Int’l Ass’n, 201 F.3d at 246-47 (holding that the employer acted inconsistently with its noticed intent to withdraw from group bargaining where employer repeatedly requested information and spoke with negotiators concerning a contract to take effect after the date of withdrawal).[8]
Here, admittedly, the line between revisions to the pre-existing contract and the drafting of a new contract is blurry. The negotiations in which Haas participated led not only to amendments to the terms of the 90-93 contract, but also to the extension of the original contract to 1994 and then the further extension of the 92-94 contract to 1996. Without downplaying the ambiguity here that makes this case a close call, in my view, Haas’s conduct was consistent with participation only in revisions to the 90-93 contract. In other words, Haas did not attempt to “secure the best of two worlds” by negotiating the terms of the extensions beyond 1993. As I have stated, the ALJ found that, as to both the first and second round of negotiations leading to contract extensions, Whitelock made no proposals during the negotiations and did not vote on any contract change to take effect after June 30,1993, and specifically did not vote on the contract extensions. In fact, the ALJ found that, in the second round of negotiations, as soon as discussions turned to changes to take effect past June 30, 1993, Whitelock stopped attending.[9] The ALJ further pointed out *31 that the negotiations were very informal, that there was no agenda, and that contractors such as Haas could have no way of knowing what interim changes would take place without attending the meetings. I see no substantial evidence here that Haas’s conduct during the negotiations was consistent with any goal other than influencing the terns of the contract up to June 30, 1993, the date through which it was bound by the contract.[10] The facts before us are thus fundamentally distinguishable from the facts of the related precedent.[11]
I am further unconvinced by the Board's reasoning that, having decided to take advantage of the renegotiated lower wage rates, Haas was also bound by the extension of the contract. The logic here seems to be that, having repudiated the right of NECA to negotiate on its behalf, Haas was bound by the original terms of the 90-93 contract and could not take advantage, even just through June 30, 1993, of any concessions negotiated by NECA. Instead, the logic goes, Haas should have negotiated any concessions it wanted individually with the union. Unquestionably the position taken by the Board on this issue was overly formalistic and unduly harsh. Haas was bound by the terms negotiated in the existing 90-93 contract through its expiration. When it agreed to be bound by the terms negotiated by NECA for 90-93, part of what Haas bargained for was that it would not be standing alone and that the other employers in the association would have the same obligations that Haas had. To penalize Haas for taking advantage of the reduced wages through June 30, 1993, would be to deprive it of the benefit of the collective action it got as part of the initial contract to which it continued to be bound. Only after June 30, 1993, is Haas fairly required to stand alone.
IV. Remedy
Although the panel appears to be in agreement that the Board erred in holding that Haas’s notice was not unequivocal, we have parted ways on whether the second holding — that Haas behaved inconsistently with its stated intent to withdraw recognition from NECA — also constitutes an incorrect application of the Act. Our dissenting colleague argues that the holding today *32 denying enforcement of the Board’s order constitutes a judgment that one set of policy considerations should prevail over another and thus a departure from the deference we owe the Board in its administration of the Act. However, it is my position that the holding today is not merely a “choice between two fairly conflicting views,” Universal Camera Corp., 340 U.S. at 488, 71 S.Ct. 456, but rather a determination that the Board’s conclusions regarding Haas’s subsequent behavior were not supported by substantial evidence, especially in light of factual findings set out by the ALJ and adopted by the Board. “[A] reviewing court,” after all, “is not barred from setting aside a Board decision when it cannot conscientiously find that the evidence supporting that decision is substantial, when viewed in the light that the record in its entirety furnishes, including the body of evidence opposed to the Board’s view.” Id. It is also worth noting again here that the “evidence supporting a conclusion may be less substantial when an impartial, experienced examiner who has observed the witnesses and lived with the case has drawn conclusions different from the Board’s,” as the ALJ did here, “than when he has reached the same conclusion.” Id. at 496, 71 S.Ct. 456.
My concurring colleague also characterizes the Board’s holding as a policy choice, but one that may or may not be within the Board’s authority under the Act. She has suggested that a remand may have been a more appropriate course of action, in that it would have given the Board a chance to explain the policy reasons behind the rule it announced. While a better explanation undoubtedly would have made our review easier, this is not an appropriate case for a remand. The Court has in the past remanded primarily only in situations where the Board departed, without explanation, from its own clearly established precedent. See, e.g., Shaw’s Supermarkets, Inc. v. NLRB, 884 F.2d 34, 41 (1st Cir.1989). Moreover, as Judge Lynch has pointed out, this dispute originated in July 1993 and has divided every decision-making body along its way to this court. A remand, after nine years of uncertainty, would only compound the injustice Haas has experienced in having to wait this long for a resolution.
V. Conclusion
I thus vote to grant Petitioner’s request for relief and deny the Board’s cross-petition for enforcement.

. Somewhat puzzlingly, the letter opened with the statement that "[i]t has come to my attention that NECA is seriously considering renegotiating the existing contract with [the Union],” even though Haas's representative Whitelock had attended the negotiations and was aware that negotiations had been completed.

. This letter was apparently not copied to the Union.

. Although “[a] union must usually demonstrate majority support among an employer's employees in order to enter a collective bargaining agreement with an employer,” NLRB v. Goodless Bros. Elec. Co., Inc., 285 F.3d 102, 104 (1st Cir.2002), under section 8(f), unions and employers in the construction industry may enter into collective bargaining agreements in the absence of a demonstration of majority representation by the union. Id. at 104-105. These "prehire agreements” allow employers to fix labor costs before employees are hired, thus making it easier to bid on jobs.

. Haas has not challenged the Board’s conclusion that the case before us is governed by the rules set out in Retail Associates. The Board acknowledged that Luterbach, which held that mere inaction could not bind an employer to multiemployer bargaining for a new 8(f) contract, cast some doubt on the applicability of Retail Associates to the facts of this case. Luterbach, 315 N.L.R.B. at 979; *28 see Board Opinion at 5, n. 14. However, the Board found that nothing in Luterbach suggested that Retail Associates would not apply where the employer had given the multiem-ployer group continuing authority to bargain on its behalf. As Haas has not challenged this finding, we do not reach it.

. Section 10(e) of the Act provides that "[t]he findings of the Board with respect to questions of fact if supported by substantial evidence on the record considered as a whole shall be conclusive.” 29 U.S.C. § 160(e).

. I also find unconvincing the Board's assertion that "[s]ince the contract in effect at that time was not scheduled to expire until June 30, 1993, more than a year later, the letter constituted at most an anticipatory breach of a valid contract.” Board Opinion at 3. The letter of assent required at least 150 days notice; thus, Haas's notification more than a year prior to the expiration of the contract is not inconsistent with its intent to terminate NECA's authority at the end of the 90-93 contract.

. It is possible that neither one of these letters, standing alone, provided unequivocal notice of withdrawal of NECA's authority. The June 29, 1992 letter was a reassertion that the January 2, 1992 letter had revoked NECA's bargaining authority. The November 4, 1992 letter was apparently not copied to the Union and purported to resign Haas’s membership in NECA rather than withdraw NECA's authority to bargain on its behalf, two legally distinct relationships. See Int’l Ladies' Garment Workers' Union, 286 N.L.R.B. 226, 231 (1987), enforced, 853 F.2d 918 (3d Cir.1988). Here, however, the fact that Haas twice reiterated its intent to withdraw tends to show that the notice was unequivocal.

. It is noteworthy that the two cases in which the "best of two worlds” doctrine has its roots, Associated Shower Door, 205 N.L.R.B. at 677, and Michael J. Bollinger Co., 252 N.L.R.B. 406 (1980), enforced, 705 F.2d 444 (4th Cir.1983), are cases where an employer informed the union and the multiemployer unit that it was withdrawing effective immediately, and then proceeded to take action that was inconsistent with an immediate withdrawal.

. The Board mentions in passing that White-lock had been appointed to a one-year term as vice president of NECA around the time of the second reopener negotiations. Board Opinion at 2. We note that there is no inconsistency between Whitelock's position as an officer of NECA and Haas’s expressed intent to withdraw NECA's authority to bargain on its behalf. In International Ladies’ Garment Workers’ Union, the Board ruled that, where the owner of a business, after notice of withdrawal from group bargaining, continued in his *31 role as a member of the subcommittee negotiating the new contract, the employer had not acted inconsistently with its stated intent to withdraw. 286 N.L.R.B. at 231. The Board found that the owner’s participation in the discussions had been extremely limited and evidenced a position of continued membership in the association without delegation to the association of the right to bargain on its behalf, a status permitted by the agreement between the union and the association. Id. We believe the facts of the case before us are even more favorable to a finding of no inconsistency, given the ALJ’s determination that Whitelock refrained from participating in any discussions related to the contract extension.

. A possible exception is a letter sent to NECA by Haas on April 28, 1993, arguing against a wage increase, which, Haas mistakenly believed, would take place after the expiration of the original contract. We agree here with the ALJ that this single letter— intended, according to Haas's testimony, for NECA and not the Union — is not sufficiently inconsistent with the remainder of Haas’s conduct to change our position.

. In light of the above discussion, I also find that Whitelock need not have affirmatively announced the limited nature of his participation in the negotiations over the interim changes to the collective bargaining agreement. Although the unqualified participation of an employer in group bargaining has been considered a factor in determining whether the employer has nullified a previously expressed intent to withdraw, this factor has, again, been raised only in cases where negotiations concerned a successor agreement. See, e.g., Sheet Metal Workers’ Int'l Ass’n, 201 F.3d at 245-47; Dependable Tile Co., 268 N.L.R.B. at 1147; NLRB v. Associated Shower Door Co., 512 F.2d 230, 233 (9th Cir.1975).